UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JEFFREY J. HENNEBERG, D.D.S., P.C., individually and on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DELTA DENTAL OF WASHINGTON, a Washington corporation,<br><br>Defendant. | CASE NO. 2:26-cv-02185<br><br>**NOTICE OF REMOVAL**<br><br>King County Superior Court<br>Case No. 26-2-17443-1 SEA |

**NOTICE OF REMOVAL**

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON:**

**PLEASE TAKE NOTICE** that Delta Dental of Washington ("DDWA"), by and through its undersigned counsel, removes the above-captioned action from the King County Superior Court (No. 26-2-17443-1 SEA) to the United States District Court for the Western District of Washington under 28 U.S.C. §§ 1332, 1441, 1442, 1446, and 1453, based on federal jurisdiction conferred by the federal officer removal statute and the Class Action Fairness Act ("CAFA").



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

**INTRODUCTION**

1. Since the 1960s, DDWA has worked with the Delta Dental Plans Association ("DDPA"), DeltaUSA, and 38 other Delta Dental Member Companies ("DDMCs") to sell affordable, high-quality dental insurance as part of the Delta Dental joint venture.[1]

2. Plaintiff Jeffrey J. Henneberg, D.D.S., P.C.—a dental service provider ("Provider")—falsely alleges that DDWA colluded with DDPA, DeltaUSA, and the other 38 DDMCs to suppress the reimbursements that Providers receive for treating Delta Dental insureds in violation of Washington antitrust law. Although Plaintiff claims that the challenged conduct applied uniformly throughout the United States, Plaintiff only named DDWA as a Defendant.

3. Plaintiff omitted DDPA and DeltaUSA from this lawsuit in a transparent attempt to escape from a federal court's rejection of identical arguments that DDWA and other members of the Delta Dental joint venture allegedly committed *per se* illegal antitrust violations. *See In re Delta Dental Antitrust Litig.*, 800 F. Supp. 3d 898, 905-14 (N.D. Ill. 2025). To that end, the court found that the record supports "defendants' account . . . that their association represents not a conspiracy among erstwhile competitors who combined to stifle competition and exercise monopsony power over dental service providers, but rather a legitimate collaboration among state-based dental services corporations," which "allowed them to compete effectively with national insurers." *Id.* at 908. From there, the court held "that plaintiffs' proposed geographic market does not 'correspond to the commercial realities of the industry.'" *Id.* at 919. And it denied their motion

[1] This Notice refers to the Delta Dental Member Company operating in a state as "DD__," where the blank is the state's two-letter abbreviation (apart from Pennsylvania).



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

for class certification because individualized questions predominated over common ones. *Id.* at 929-31.

4. The same counsel represents the plaintiffs in the *Delta Dental* multidistrict litigation and Plaintiff here.

5. With their federal case collapsing, Plaintiff's counsel has turned to the states. In April, counsel filed four substantially similar class-action lawsuits on behalf of Providers in California, Massachusetts, Michigan, and Wisconsin. This lawsuit followed a few weeks later. Each lawsuit alleged that the local DDMC conspired with DDPA, DeltaUSA, and the 38 other DDMCs to suppress Provider reimbursements nationwide. Yet unlike the ongoing federal case (where all of the Delta Dental entities are currently named defendants), here Plaintiff only named the local DDMC as the sole defendant and purported to ground the claims in state law.

6. Counsel's efforts to gerrymander this suit and others like it to escape federal jurisdiction fail. In fact, removal is proper on two, independent grounds.

7. First, removal is proper under 28 U.S.C. § 1442 because DDWA acted under a federal officer in implementing a host of dental benefit plans for the federal government, including through the military's TRICARE program, the Federal Employees Dental and Vision Insurance Program ("FEDVIP"), the Veterans Affairs Dental Insurance Program ("VADIP"), and Medicare Advantage.

8. Second, removal is proper under CAFA because this case is a putative class action with more than $5 million at stake. *See* 28 U.S.C. § 1332(d). And although Plaintiff failed to name DDPA and DeltaUSA as defendants, their citizenship still establishes minimal diversity under CAFA because they are defendants in federal multidistrict litigation of overlapping claims,



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

Plaintiff alleges that DDPA and DeltaUSA orchestrated the alleged conspiracy, and Plaintiff had no reason to omit DDPA and DeltaUSA from this suit save for defeating DDWA's removal rights.

## BACKGROUND

### I. Factual Background

9. DDWA and other DDMCs have offered affordable, high-quality dental insurance to government entities, businesses, unions, and individuals for more than 50 years.

10. DDWA and other DDMCs recruit Providers to join Delta Dental's networks. In-network Providers agree to accept discounts for treating patients with Delta Dental insurance. Because patients with Delta Dental insurance tend to visit Providers in Delta Dental's networks, Providers can expect a higher patient volume—and thus more income—if they enroll. Delta Dental offers several Provider networks, of which the largest are Delta Dental PPO and Delta Dental Premier.

11. DDMCs vigorously compete for dental benefits business with national insurers like Aetna, Cigna, Guardian, MetLife, and UnitedHealthcare. The DDMCs do so by working together to sell dental insurance under the Delta Dental brand as part of the Delta Dental joint venture.

12. The Delta Dental joint venture was formed more than 50 years ago to overcome practical and legal barriers that made it difficult for the predecessors of DDMCs to compete with for-profit dental insurance companies nationwide.

13. The concept of dental insurance took root throughout the United States in the mid-20th Century. In the 1950s, dentists began to form dental service corporations (the DDMCs' predecessors) on a state-by-state basis. The American Dental Association ("ADA") defined a dental service corporation as a "legally constituted not-for-profit organization sponsored by a state



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

dental society to negotiate and administer contracts for group dental care" in that state and described them as "the most effective mechanisms" to expand access to dental insurance.

14. As demand for dental insurance grew throughout the 1960s, businesses and unions sought dental insurance plans that offered coverage to enrollees (*e.g.*, their employees and members) in multiple states. But, as the ADA recognized, state law often "rigidly limited" dental service corporations "to operate only within the political boundaries of the[ir] state." In light of these limitations, dental service corporations "had to turn down contracts which would have involved coverage in more than their own state."

15. To overcome this challenge, the ADA in 1964 created "a national coordinating agency" for dental service corporations called the National Association of Dental Service Plans ("NADSP"). The NADSP's goal was to facilitate cooperation among dental service corporations that would allow them to offer dental insurance with coverage in multiple states.

16. With the NADSP's help, dental service corporations began offering dental insurance plans with multistate coverage in 1967 and 1968. To provide such coverage, one dental service corporation would serve as the control plan and contract with a customer, such as a business or union. Then, pursuant to contracts among the control plan, NADSP, and other dental service corporations, the customer's insureds (*e.g.*, employees or members) could obtain dental care from Providers in other states on equal terms with the local dental service corporation's own insureds. This model allowed individual dental service corporations to administer national accounts while maintaining strong relationships with, and responding to the needs of, Providers and customers in their respective states.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

17. In 1968, the Delta Dental name and symbol were created to identify dental service corporations working with the NADSP to sell dental insurance throughout the United States. After this change, the NADSP became known as the Delta Dental Plans Association, and the dental service corporations became known as Delta Dental Member Companies.

18. Since then, DDPA has licensed the Delta Dental trademark to DDMCs for use in service areas corresponding to their historic areas of operation. The terms under which DDMCs license the Delta Dental trademark from DDPA are set forth in a contract called the Service Mark License Agreement.

19. In exchange for the right to use the Delta Dental trademark in their operating areas, DDMCs agree to follow DDPA policies governing Delta Dental-branded products. These conditions, which help ensure that dental plans sold under the Delta Dental brand deliver consistent, high-quality benefits throughout the United States, are set forth in the DDPA Membership Standards and Guidelines.

20. Members of the Delta Dental joint venture have long provided dental benefits for members of the United States military, other federal employees, and their families on behalf of the federal government. In 1987, DDCA won a contract with the U.S. Department of Defense to administer a dental benefit plan for members of the United States military and their families as part of the Civilian Health and Medical Program for the Uniformed Services ("CHAMPUS," now called TRICARE).

21. Because CHAMPUS beneficiaries lived throughout the United States, DDCA worked with other DDMCs to administer the account. To do so, the DDMCs (including DDWA) created a central database containing information about Providers, such as names, addresses, and



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

fees. Each DDMC could query the database on a case-by-case basis to figure out the applicable reimbursement after one of its insureds obtained dental care from a Provider in another DDMC's service area. The DDMC could then use this data to pay the Provider for the services rendered.

22. For example, when an enrollee in DDCA's CHAMPUS plan obtained dental care from a Provider in Washington, DDCA could query the database to retrieve the applicable DDWA reimbursement. DDCA would then reimburse the Provider at that rate for the services rendered. This database became known as the National Provider File ("NPF").

23. Based on the NPF's success in allowing DDMCs to administer the CHAMPUS account, DDPA made the NPF available for other multistate accounts in 1990. That same year, DDPA created a subsidiary called DeltaUSA to manage the NPF. Since then, DDMCs have used the NPF to process claims for both governmental and non-governmental accounts.

24. DeltaUSA has adopted processing policies set forth in the DeltaUSA Processing Policy Manual to facilitate the quick and accurate payment of claims for Delta Dental's multistate business. The policies also ensure that Delta Dental's multistate products align with clinically accepted standards of care. For example, although Providers can often bill patients directly for services outside the patient's dental plan, they cannot obtain reimbursement or bill patients for duplicative or otherwise inappropriate procedures.

## II. Procedural Background

### A. The *Delta Dental* Multidistrict Litigation

25. In 2019 and 2020, more than 20 Providers sued DDPA, DeltaUSA, and all 39 DDMCs in federal courts across the United States. According to those Providers, members of the



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

Delta Dental joint venture had exercised market power to suppress Provider reimbursement rates in violation of federal and state antitrust law.

26. Because these lawsuits involved "common questions of fact," including whether DDMCs had exercised market power to "restrict competition between the Delta Dental insurers" and "reduce the amounts of reimbursement paid by the Delta Dental insurers to dentists," as well as "overlapping putative nationwide and state classes," the Judicial Panel on Multidistrict Litigation ("JPML") transferred the cases to the U.S. District Court for the Northern District of Illinois for coordinated or consolidated pretrial proceedings. *In re Delta Dental Antitrust Litig.*, 433 F. Supp. 3d 1358, 1359-60 (J.P.M.L. 2020).

27. After five years of litigation involving over 100 depositions (including depositions of DDWA's executives) and millions of documents, the *Delta Dental* plaintiffs moved for certification of a nationwide Provider class.

28. The court denied class certification in a 70-page opinion. It first rejected the plaintiffs' argument that the challenged conduct—including the use of exclusive service areas, performance metrics, and the NPF—was *per se* illegal. *See Delta Dental*, 800 F. Supp. 3d at 905-14. Rather, the court held, that conduct had to be evaluated under the Rule of Reason because undisputed evidence demonstrated that it "could reasonably have been believed to promote enterprise and productivity" when adopted. *Id.*

29. Under the Rule of Reason, the plaintiffs had to establish the defendants' power in relevant geographic and product markets. They could not do so on a class-wide basis, however, because their expert had ignored local variation in market conditions. *See id.* at 918-23. His disregard for local market conditions also rendered his injury and damages model unpersuasive.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

*See id.* at 928-30. Absent common proof of market power or injury, the court concluded, class treatment was inappropriate. *See id.* at 930-31.

30. The Seventh Circuit denied the plaintiffs' petition for review of the denial of class certification. Order, *In re Delta Dental Antitrust Litig.*, No. 25-8026 (7th Cir. Nov. 24, 2025), ECF No. 17. The *Delta Dental* plaintiffs maintain that the court's denial of class certification was incorrect and have indicated their intent to appeal at the conclusion of the case. *See, e.g.*, [Proposed] First Am. Consolidated Class Action Compl. ¶¶ 97, 191 n.12, *In re Delta Dental Antitrust Litig.*, No. 1:19-cv-06734 (N.D. Ill. Jan. 7, 2026), ECF No. 950.

31. Neither the rejection of the *Delta Dental* plaintiffs' *per se* theory of liability nor the denial of class certification has dampened counsel's appetite for litigation against the Delta Dental joint venture. In a September 25, 2025 email, plaintiffs' counsel informed defendants' counsel that they were preparing to file "a multitude of new complaints."

32. A few months later, counsel sought leave to amend their *Delta Dental* complaint to join an indeterminate number of new plaintiffs and plead 20 state-specific damages classes. Memo. of Law in Supp. of Pls.' Mot. to Amend the Consolidated Class Action Compl. 13, *In re Delta Dental Antitrust Litig.*, No. 1:19-cv-06734 (N.D. Ill. Jan. 7, 2026), ECF No. 949. In support, counsel informed the court that they were "finalizing engagement letters with" Providers to serve as representatives for the 20 statewide Provider classes, including a Washington class. *Id.* at 13 n.9.

33. The court denied the motion because it would "return" the case "to square one" after "expansive, multi-district proceedings that featured dozens of contested motions and discovery that ensnared a number of defendants' competitors and yielded over a hundred



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

depositions and a million documents." Order 1, *In re Delta Dental Antitrust Litig.*, No. 1:19-cv-06734 (N.D. Ill. Jan. 23, 2026), ECF No. 960. Nor was there a reason to "reset[] the litigation from the start" when the "only 'circumstance' that has materially changed is plaintiffs' litigation strategy following their failure to win certification of the nationwide class they proposed." *Id.* at 3-4.

34. The parties in the *Delta Dental* multidistrict litigation are now briefing merits *Daubert* motions, with summary-judgment briefing to follow. *See In re Delta Dental Antitrust Litig.*, No. 1:19-cv-06734 (N.D. Ill. Apr. 29, 2026), ECF No. 1056.

**B. The State-Court Lawsuits**

35. Plaintiff's counsel has now shifted strategies again. On April 30, 2026, counsel for the *Delta Dental* plaintiffs filed four state-court class-action lawsuits against individual DDMCs on behalf of Providers in California, Massachusetts, Michigan, and Wisconsin. *See Daniel Meir Klein DDS APC v. Delta Dental of Cal.*, No. 26STCV13923 (Cal. Super. Ct. Apr. 30, 2026); *Levenson v. Dental Serv. of Mass. Inc.*, No. 2684CV01279 (Mass. Super. Ct. Apr. 30, 2026); *Fritz v. Delta Dental Plan of Mich., Inc.*, No. 2026-222704-CB (Mich. Cir. Ct. Apr. 30, 2026); *Cudahy Dental Assocs., S.C. v. Delta Dental of Wis., Inc.*, No. 2026CV004125 (Wis. Cir. Ct. Apr. 30, 2026). Counsel filed this lawsuit on May 28, 2026, as a putative class action on behalf of a Washington Provider. *See Jeffrey J. Henneberg D.D.S., P.C. v. Delta Dental of Wash.*, No. 26-2-17443-1 SEA (Wash. Super. Ct. May 28, 2026).

36. The allegations in these five lawsuits are substantially similar and mirror the allegations in the *Delta Dental* multidistrict litigation. Specifically, as in the federal case, all the plaintiffs allege that DDPA, DeltaUSA, and the DDMCs exercised market power to suppress Provider reimbursement rates in violation of applicable antitrust and unfair-competition law by,



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

among other things, licensing the Delta Dental trademark for use in specific service areas, adhering to DDPA performance metrics, and exchanging information through the NPF. Also included are allegations that DDPA limited the extent to which DDMCs can sell dental insurance under non-Delta Dental brands (or "second brands")—just like in the multidistrict litigation.

37. The conduct challenged in these lawsuits dates back decades. For example, Plaintiff seeks damages based on DDMC use of exclusive service areas, which arise from trademark licenses that have existed since the 1960s. *Cf.* Ex. 1 ("Compl.") ¶¶ 30-31, 125 (challenged conduct began on an "unknown" date). The complaint also alleges that DDMCs have exchanged information through the NPF since 1987. Compl. ¶ 33. Plaintiff seeks relief "to redress" and "dissipate the anticompetitive effects of" the challenged conduct during this time. Compl. at 39.

38. Although these new lawsuits all present nearly identical claims, they name different defendants. The California plaintiffs sued only DDCA; the Massachusetts plaintiffs sued only DDMA; the Michigan plaintiffs sued only DDMI; the Washington plaintiff sued only DDWA; and the Wisconsin plaintiff sued only DDWI.

39. Each suit was lodged as a putative class action. Plaintiff and the putative class of Providers here—like the other state-court plaintiffs and their putative classes—are all members of the classes alleged in the *Delta Dental* multidistrict litigation. *Compare* Compl. ¶¶ 120-21, *with* Consolidated Compl. ¶¶ 140-41, *In re Delta Dental Antitrust Litig.*, No. 1:19-cv-06734 (N.D. Ill. Nov. 26, 2019), ECF No. 96 [hereinafter *Delta Dental* Compl.].

40. All the suits claim that DDPA and DeltaUSA orchestrated the alleged conspiracy. In the complaint's words, DDPA and DeltaUSA "act as administrators and watchdogs for the Delta Dental insurance plans" and serve "as vehicles for their concerted activity." Compl. ¶ 4; *see also*



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

*id.* ¶ 65 (alleging that "DDPA serves as the central hub facilitating and coordinating . . . information sharing" among DDMCs). The complaint also seeks to invalidate numerous contracts to which DDPA and DeltaUSA are parties, including the Service Mark License Agreement, the DDPA Membership Standards and Guidelines, and the DeltaUSA Processing Policy Manual. *Id.* ¶¶ 34-36. Because this litigation may impair DDPA's and DeltaUSA's ability to protect their trademark rights, contractual rights, and other interests, both moved to intervene as defendants on June 18, 2026. As of the date of removal, this motion remains pending.

## **GROUNDS FOR REMOVAL**

41. A notice of removal need only plausibly allege a basis for removal. *See* 28 U.S.C. § 1446(a) (requiring "a short and plain statement of the grounds for removal"); *see also Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 88-89 (2014).

42. There are at least two independent bases for removal. First, Plaintiff challenges conduct related to DDWA's work for the federal government, and DDWA has colorable federal defenses. The federal officer statute thus authorizes removal. *See* 28 U.S.C. § 1442(a). Second, CAFA confers federal jurisdiction because this is a putative class action with more than $5 million at stake and minimal diversity based on DDPA's and DeltaUSA's Illinois citizenship, which counts because DDPA and DeltaUSA—principal targets of Plaintiff's complaint—face overlapping claims in the *Delta Dental* multidistrict litigation. *See* 28 U.S.C. § 1332(d).

### **I. Removal Is Proper Under The Federal Officer Statute**

43. Under 28 U.S.C. § 1442, defendants acting under federal officers can remove suits relating to their work for the government:



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

> (a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> > (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . . .

44. "Under the federal officer removal statute, a removing defendant must satisfy three requirements. First, the removing defendant must be the United States, a federal agency, a federal officer, or a person 'acting under' a federal officer, such as certain private parties hired to assist federal officers. Second, the suit must be 'for or relating to any act under color of such office.' Third, the removing defendant must assert 'a colorable federal defense.'" *Chevron USA Inc. v. Plaquemines Parish*, 146 S. Ct. 1052, 1057-58 (2026) (citations omitted). In evaluating whether these elements hold, the Court must "credit [DDWA's] theory of the case." *Jefferson County v. Acker*, 527 U.S. 423, 432 (1999).

45. DDWA is a nonprofit corporation and thus a "person" under 28 U.S.C. § 1442(a). *See Ohio ex rel. Yost v. Ascent Health Servs., LLC*, 165 F.4th 999, 1004 (6th Cir. 2026).

46. Contractors "helping [a federal] official to enforce federal law" act under federal officers for purposes of 28 U.S.C. § 1442(a). *Watson v. Philip Morris Cos.*, 551 U.S. 142, 151 (2007). Specifically, contractors hired "to *assist*, or to help *carry out*, the duties or tasks of the federal superior" while "[s]ubject to the instruction, direction, or guidance of" that superior meet 28 U.S.C. § 1442(a)'s acting-under requirement. *Id.* at 151-52.

47. Establishing that challenged conduct relates to the defendant's acts under a federal officer is not difficult, as "a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct." *Chevron*, 146 S. Ct. at 1060. Rather, it is


DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

enough for the defendant to "plausibly allege[]" that performance of its federal duties "may have suffered" if it had not engaged in the challenged conduct. *Id.* at 1061.

48. The requirement to set forth a colorable federal defense also presents a low bar. Because the federal officer removal statute is designed "to have the validity of the [federal] defense . . . tried in a federal court," *Willingham v. Morgan*, 395 U.S. 402, 407 (1969), the "validity of the defence . . . has no connection whatever with the question of jurisdiction," *The Mayor v. Cooper*, 73 U.S. 247, 254 (1867).

49. All three elements for federal officer removal are present due to DDWA's role in implementing four of the Delta Dental joint venture's federal programs: TRICARE, FEDVIP, VADIP, and Medicare Advantage.

**A. DDWA's Support For Delta Dental's TRICARE Work Allows Removal.**

50. The TRICARE program provides medical and dental care to members of the United States military, their families, and military retirees. TRICARE's purpose "is to create and maintain high morale in the uniformed services by providing an improved and uniform program of medical and dental care for members and certain former members of those services, and for their dependents." 10 U.S.C. § 1071. As part of TRICARE, the "Secretary of Defense may establish, and [for certain service members] shall establish, . . . voluntary enrollment dental plans," 10 U.S.C. § 1076a(a), and "shall establish a dental insurance plan for retirees of the uniformed services, certain unremarried surviving spouses, and dependents," 10 U.S.C. § 1076c(a).

**1. DDWA Acted Under A Federal Officer In Supporting Delta Dental's TRICARE Work.**

51. TRICARE dental benefits are offered through dental plans administered by private insurers. *See* 10 U.S.C. §§ 1076a(b)(2)(C), 1076c(a)(2). Insurers administering dental plans for



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

TRICARE beneficiaries are subject to the government's instruction, direction, and guidance. For example, federal statutes govern all aspects of plan design and administration, including what dental services must be covered and how much can be charged in premiums. *See* 10 U.S.C. §§ 1076a(c)-(d), 1076c(c)-(d). Federal regulations further detail the requirements to which dental insurers providing TRICARE benefits are subject.

52. Regulations governing the TRICARE dental program ("TDP") provide that the "method of delivery of the TDP is through a competitively procured contract" with an insurer responsible for the "[d]evelopment, publication, and enforcement of benefit policy, exclusions, and limitations in compliance with the law, regulation, and the contract provisions," as well as "[a]djudicating and processing claims; and conducting related supporting activities, such as enrollment, disenrollment, collection of premiums, eligibility verification, provider relations, and beneficiary communications." 32 C.F.R. § 199.13(a)(5)(iv). The regulations also make clear that the insurer's "fee or charge determinations are binding upon the provider in accordance with the dental plan contractor's procedures for participation in the network." 32 C.F.R. § 199.13(f)(5). Beyond that, insurers must meet network-breadth requirements and face sanctions if enrollees are unable to obtain adequate in-network dental care. *See* 32 C.F.R. § 199.13(e)(3)(ii).

53. Equally complex regulations govern the TRICARE retiree dental program ("TRDP"). Like the TRICARE dental program, the TRICARE retiree dental program "shall be administered through a contract" with private insurers. 32 C.F.R. § 199.22(b)(5). Regulations define the covered services, with the final "benefit policy decisions made by the Director, TRICARE Management Activity, or designee." 32 C.F.R. § 199.22(b)(1); *see also id.* § 199.22(f) (authorizing government to "modify the services covered" and "establish . . . exclusions and



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

limitations”). Reimbursements, too, are subject to federal control, including “maximum payment[s] allowable” based on local “Usual, Customary and Reasonable Rates.” 32 C.F.R. § 199.22(j). So are the bills of participating Providers, who cannot charge enrollees “any amount in excess of the maximum payment allowable by the TRDP.” *Id.*

54. Because TRICARE contractors “operate[] under the Department of Defense’s ‘subjection, guidance[,]’ and ‘control,’” they act under federal officers for purposes of the federal officer removal statute. *Ascent*, 165 F.4th at 1005-06; *see also Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 253-54 (4th Cir. 2021) (observing that “Defendants were essentially acting as the statutorily authorized *alter ego* of the federal government, as the TRICARE statute requires the Secretary of Defense to contract out the administration of the [relevant TRICARE] program”).

55. Members of the Delta Dental joint venture began to contract with the government to administer dental plans for beneficiaries of TRICARE (and predecessor programs) in the 1980s. In 1987, Delta Dental won a contract with the Department of Defense to provide dental benefits for beneficiaries of the CHAMPUS program, which became TRICARE. This contract—the largest dental benefit plan ever written at the time—covered more than 600,000 people.

56. To support the CHAMPUS account and develop other federal business, DDWA and a number of other DDMCs formed a joint venture called the Federal Marketing Group in 1997. DDCA acts as the Federal Marketing Group’s exclusive representative in contracting with the government. Other members of the Federal Marketing Group support DDCA’s federal business, including sharing the risk of DDCA’s contracts. *See* Ex. 9, Brand Decl. ¶ 7.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

57. DDMCs help DDCA implement DDCA's federal contracts. For example, DDWA and other DDMCs built and maintained Provider networks available to enrollees in Delta Dental-branded dental benefit plans for TRICARE and other federal programs. DDWA and other DDMCs also established schedules of rates at which Providers are reimbursed for treating Delta Dental insureds, including enrollees in TRICARE and other dental benefit plans for federal employees.

58. Acting for the Federal Marketing Group, DDCA administered dental benefit plans for beneficiaries of CHAMPUS and TRICARE under a series of federal contracts, including TRICARE retiree dental program contracts. DDCA was subject to the government's instruction, direction, and guidance in administering dental benefit plans for CHAMPUS and TRICARE beneficiaries, so it acted under a federal officer in doing so.

59. Because DDCA contracted with the government to administer the TRICARE account on the Federal Marketing Group's behalf, and because DDWA helped DDCA implement those contracts—including through establishing the rates at which Providers would be reimbursed for treating TRICARE enrollees in Washington and facilitating the processing of their claims—DDWA acted under a federal officer in doing so.

**2. DDWA's Support For Delta Dental's TRICARE Work Relates To The Challenged Conduct.**

60. The challenged conduct "relat[es] to" DDWA's role in supporting Delta Dental's TRICARE work. 28 U.S.C. § 1442(a).

61. Plaintiff alleges that DDWA and other DDMCs fix prices "through the National Provider File." Compl. ¶ 7. The NPF was created to service the CHAMPUS account. According to Delta Dental records, DDMCs "agreed to share their provider data (names, addresses and fees) so the administration of this very large account could be centralized." Centralization was critical



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

because CHAMPUS beneficiaries obtained dental care throughout the United States, so DDMCs processing their claims had to be able to retrieve the applicable DDMC reimbursement rates nationwide, including from Washington Providers contracting with DDWA. Indeed, Delta Dental's proposal promised the government "access to a unique, new National Provider File." And Plaintiff agrees that the Delta Dental joint venture's work for CHAMPUS "led to the creation of the National Provider File." Compl. ¶ 33.

62. DDMCs used the NPF to process claims for federal accounts alongside their other multistate business. In particular, DDWA input into the NPF Provider data (such as names, addresses, and fees), which were used to process claims of TRICARE beneficiaries.

63. DDWA's use of the NPF for TRICARE and non-TRICARE plans cannot be separated because DDWA uploaded a single set of information to the NPF for each participating Provider in its service area. This information was used to process claims of both TRICARE and non-TRICARE beneficiaries who obtained dental care from that Provider. Indeed, DDWA did not—and could not—know in advance whether TRICARE or non-TRICARE beneficiaries would obtain these services.

64. Because the NPF was created for the CHAMPUS account and DDWA used the NPF to facilitate the processing of claims for TRICARE beneficiaries, DDWA's use of the NPF related to DDWA's acts under a federal officer.

65. Delta Dental's TRICARE contracts required maintaining broad Provider networks accessible to beneficiaries throughout the United States—the same networks built and maintained through the exclusive service areas and performance targets that Plaintiff challenges here. Compl. ¶¶ 50-62, 81-83. Those mechanisms existed in part to allow DDWA and other DDMCs to recruit



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

and retain sufficient Providers to meet Delta Dental's federal contractual obligations tracing to Delta Dental's TRICARE and CHAMPUS work. The challenged conduct thus relates to DDWA's support for Delta Dental's TRICARE work in multiple ways.

66. DDWA's support for Delta Dental's TRICARE work is relevant because the NPF (which Plaintiff challenges) was created for and in the performance of Delta Dental's TRICARE obligations, and the complaint challenges that conduct during the period of the TRICARE contract. Compl. ¶ 120 & pp. 38-39 (seeking relief based on all past conduct); *see also supra* ¶ 37 (discussing how the complaint challenges conduct that occurred over many decades). In particular, although the complaint defines a damages class of Providers who contracted with DDWA since 2022, *id.* ¶ 121, nothing in the complaint limits damages to the consequences of conduct occurring during or after 2022. Moreover, the NPF is indivisible across federal and non-federal accounts because DDWA and other DDMCs uploaded single sets of Provider data, which were (and are) used to process all claims, regardless of program. As a result, the challenged conduct cannot be separated from DDWA's facilitation of the processing of dental claims for federal accounts either before or after specific dates.

67. More than 475,000 veterans live in Washington.[2] Providers in Washington who were parties to a Delta Dental participating provider agreement, including Delta Dental PPO participating provider agreements, supplied dental goods and services to veterans enrolled in TRICARE dental plans through Delta Dental, for which the Providers obtained reimbursements from one or more DDMCs at applicable DDWA PPO reimbursement rates. DDWA's

[2] Wash. State Dep't of Veterans Affairs, *Statistics* (Sep. 30, 2025), https://dva.wa.gov/resources/statistics.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

establishment of reimbursement rates therefore related to—and was inseparable from—DDWA's acts under a federal officer.

**3. DDWA's Support For Delta Dental's TRICARE Work Gives Rise To Colorable Federal Defenses.**

68. DDWA has colorable federal defenses based on its support for Delta Dental's TRICARE work.

69. One of them is federal preemption. Under 10 U.S.C. § 1103(a), any "law or regulation of a State or local government relating to health insurance, prepaid health plans, or other health care delivery or financing methods shall not apply to any contract entered into pursuant to this chapter by the Secretary of Defense or the administering Secretaries to the extent that the Secretary of Defense or the administering Secretaries determine that—(1) the State or local law or regulation is inconsistent with a specific provision of the contract or a regulation promulgated by the Secretary of Defense or the administering Secretaries pursuant to this chapter; or (2) the preemption of the State or local law or regulation is necessary to implement or administer the provisions of the contract or to achieve any other important Federal interest."

70. The government has made the requisite determination. "Pursuant to 10 U.S.C. 1103 the Department of Defense has determined that in the administration of 10 U.S.C. chapter 55, preemption of State and local laws relating to health insurance, prepaid health plans, or other health care delivery or financing methods is necessary to achieve important Federal interests, including but not limited to the assurance of uniform national health programs for military families and the operation of such programs at the lowest possible cost to the Department of Defense, that have a direct and substantial effect on the conduct of military affairs and national security policy of the United States." 32 C.F.R. § 199.17(a)(7)(i). As a result, "any State or local law relating to health



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

insurance, prepaid health plans, or other health care delivery or financing methods is preempted and does not apply in connection with TRICARE regional contracts. Any such law, or regulation pursuant to such law, is without any force or effect, and State or local governments have no legal authority to enforce them in relation to the TRICARE regional contracts." *Id.* § 199.17(a)(7)(ii).

71. Section 1103(a) preempts state law of general application, including state antitrust and unfair competition law.

72. If Washington law rendered DDWA liable for using the NPF, as Plaintiff contends, then DDWA would be penalized for supporting the administration of DDCA's federal contracts. Absent DDWA's participation in the NPF, moreover, DDCA and other DDMCs could not effectively have discharged their contractual duties to the government to process claims for TRICARE beneficiaries quickly and accurately.

73. Because application of state law barring use of the NPF would frustrate the performance of Delta Dental's federal contracts, 10 U.S.C. § 1103(a) preempts those laws.

74. DDWA's support for Delta Dental's TRICARE work confers another colorable federal defense to Plaintiff's state-law claims. When a federal contractor's "authority to carry out the project was validly conferred, . . . there is no liability on the part of the contractor for executing its will." *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20-21 (1940).

75. DDWA acted under valid federal authority in supporting Delta Dental's administration of dental benefit plans for TRICARE beneficiaries. *See, e.g.*, 10 U.S.C. §§ 1076a(b), 1076c(a). In particular, Delta Dental records report that "access" to the NPF was part of Delta Dental's "proposal" for the CHAMPUS account and that the "government likes" the NPF, which allowed for "[r]apid data gathering and aggregation" to process claims of CHAMPUS



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

beneficiaries. It follows that DDWA acted under valid federal authority when creating the NPF and using it to facilitate the processing of claims for TRICARE beneficiaries. DDWA is therefore not liable for that conduct.

76. Yet another colorable federal defense comes from *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988), which provides that federal contractors are not liable under state law "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."

77. In this case, the government set forth precise specifications for federal contractors' TRICARE work in the comprehensive framework of statutes and regulations discussed above. The government also set forth precise specifications for the administration of TRICARE dental benefit plans in a series of contracts with DDCA.

78. Delta Dental performed to the government's specifications, including with the help of DDWA and other DDMCs that formed Provider networks, established reimbursement rates, and made the reimbursement rates available in the NPF.

79. The government knew about the Delta Dental joint venture's use of the NPF to exchange information among DDMCs, so DDWA had no special knowledge of that conduct or its risks of which the government was unaware.

80. Because (1) DDWA acted under a federal officer in helping to administer dental benefit plans for TRICARE beneficiaries, (2) the challenged conduct relates to DDWA's support for Delta Dental's TRICARE work, and (3) DDWA has colorable federal defenses, 28 U.S.C. § 1442(a) authorizes removal.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

**B. DDWA's Support For Delta Dental's FEDVIP Work Allows Removal.**

81. In 2018, the TRICARE retiree dental program ended, and FEDVIP assumed much of its role. *See* 32 C.F.R. § 199.22(a)(2) (authorizing TRICARE dental coverage through FEDVIP). Since then, Delta Dental has offered dental benefits to select TRICARE beneficiaries and other federal employees through FEDVIP, *see* Ex. 9, Brand Decl. ¶¶ 9-10, 13, which is another basis for federal officer removal.

**1. DDWA Acts Under A Federal Officer In Supporting Delta Dental's FEDVIP Work.**

82. Under the Federal Employee Dental and Vision Benefits Enhancement Act of 2004, the Office of Personnel Management ("OPM") must "establish and administer a program" for federal employees and their beneficiaries to "obtain dental coverage to supplement coverage available through [the Federal Employees Health Benefits Program ("FEHBP")]." 5 U.S.C. § 8952. To provide dental benefits, OPM "shall contract with" private dental insurers, 5 U.S.C. § 8953(a)(1), who administer dental benefit plans subject to OPM's instruction, direction, and guidance.

83. Among other things, OPM can "prescribe reasonable minimum standards for enhanced dental benefit plans offered under this chapter and for qualified companies offering the plans." 5 U.S.C. § 8954(a); *see also id.* § 8954(c) (listing categories of available benefits). In addition, each "contract approved under this chapter shall require the qualified company to cover the geographic service delivery area specified by the Office," including "dentally underserved areas in their service delivery areas." 5 U.S.C. § 8954(d). OPM also establishes "the terms and conditions under which individuals are required to pay the premiums for enrollment." 5 U.S.C. § 8958(b). To enforce these provisions, participating insurers must "furnish such reasonable



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

reports as the Office determines to be necessary," allow OPM and the Government Accountability Office ("GAO") "to examine [their] records," and subject their dental benefit plans to "periodic reviews" designed "to ensure the[ir] competitiveness." 5 U.S.C. § 8960.

84. Beyond these requirements, FEDVIP dental plans are subject to some of the same requirements as FEHBP health benefit plans. *See* 5 U.S.C. § 8953(b)(1) (incorporating provisions of the Federal Employees Health Benefit Act ("FEHBA")). For example, each contract between OPM and a FEDVIP dental insurer "shall contain a detailed statement of benefits offered and shall include such maximums, limitations, exclusions, and other definitions of benefits as the Office considers necessary or desirable." 5 U.S.C. § 8902(d). Insurers also must charge rates that "shall reasonably and equitably reflect the cost of the benefits provided" and be "consistent with the lowest schedule of basic rates generally charged for new group [dental] benefit plans issued to large employers." 5 U.S.C. § 8902(i).

85. Because insurers administering dental benefit plans for FEDVIP beneficiaries are subject to the government's instruction, guidance, and control, they act under federal officers when doing so. *See, e.g., Ascent*, 165 F.4th at 1005; *Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 190 (1st Cir. 2024); *Goncalves ex rel. Goncalves v. Rady Children's Hosp.*, 865 F.3d 1237, 1245-47 (9th Cir. 2017).

86. DDCA, acting for the Federal Marketing Group, has contracted with OPM to offer dental benefit plans to FEDVIP beneficiaries from at least 2018. *See* Ex. 9, Brand Decl. ¶¶ 9, 14-24 (describing contract). Under the contract, DDCA must adhere to all requirements of the Federal Employee Dental and Vision Benefits Enhancement Act of 2004 and OPM's implementing regulations, as well as comprehensive requirements set forth in the contract itself. For example,



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

the contract defines how premiums are to be established and limits the extent to which different premiums can be charged to enrollees in different regions. It requires DDCA to make a broad Provider network available to FEDVIP beneficiaries, both in terms of geographic scope and access to specialists. It specifies hundreds of procedures that DDCA must cover by Current Dental Terminology ("CDT") code. And it states that participating Providers cannot bill patients for certain non-covered services, such as services deemed unnecessary or that are considered integral to other services.

87. To ensure compliance with these and other provisions of the contract, OPM monitors DDCA's performance. OPM also has the right to perform audits, including through on-site evaluations. And DDCA must furnish OPM with claims, utilization, and other reports. Beyond that, the contract requires DDCA to maintain adequate financial resources to perform its obligations.

88. For these reasons, DDCA's performance of its FEDVIP contract is subject to OPM's instruction, direction, and guidance. DDCA therefore acts under a federal officer in administering dental benefit plans for FEDVIP beneficiaries.

89. Because DDCA contracts with OPM to administer FEDVIP dental benefit plans on the Federal Marketing Group's behalf, and because DDWA helps DDCA implement those contracts, DDWA acts under a federal officer in doing so.

**2. DDWA's Support For Delta Dental's FEDVIP Work Relates To The Challenged Conduct.**

90. The challenged conduct "relat[es] to" DDWA's role in supporting Delta Dental's FEDVIP work. 28 U.S.C. § 1442(a).



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

91. FEDVIP dental benefit plans use both the Delta Dental PPO network (as do non-governmental accounts) and a Delta Dental Legion network (specific to government accounts). Use of the Delta Dental PPO network means FEDVIP enrollees can obtain in-network care from Delta Dental PPO Providers, who are then reimbursed at the local DDMC's rates. Ex. 9, Brand Decl. ¶¶ 23-24 (detailing FEDVIP network use). Their claims are processed on the NPF under the DeltaUSA Processing Policy Manual.

92. DDWA and other DDMCs establish schedules of reimbursement rates for Delta Dental PPO Providers in their respective service areas without distinguishing between services provided to FEDVIP enrollees and non-FEDVIP enrollees. That is, a PPO Provider receives the same reimbursement for treating a FEDVIP beneficiary as the Provider would receive for treating a beneficiary of a non-governmental PPO dental benefit plan.

93. More than 75,000 federal employees live in Washington.[3] Providers in Washington who were parties to a Delta Dental participating provider agreement, including Delta Dental PPO participating provider agreements, supplied dental goods and services to persons enrolled in FEDVIP dental benefit plans through Delta Dental, for which the Providers obtained reimbursements from one or more DDMCs at applicable DDWA PPO reimbursement rates from at least 2019 to the present. DDWA's establishment of reimbursement rates therefore related to—and was inseparable from—DDWA's acts under a federal officer.

[3] Fed. Reserve Bank of St. Louis, *All Employees: Government: Federal Government in Washington* (Apr. 10, 2026), https://fred.stlouisfed.org/series/SMU53000009091000001A.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

94. Other challenged conduct—including exclusive service areas, the effective-discount target, DeltaUSA's Processing Policies, and DDWA's level of surplus—also helps DDWA implement Delta Dental's FEDVIP contract.

95. Plaintiff challenges provisions in the Service Mark License Agreement and DDPA Membership Standards and Guidelines generally requiring DDWA and other DDMCs to use the Delta Dental trademark within their historic areas of operation. Compl. ¶¶ 50-62. The use of exclusive service areas helps DDWA and other DDMCs build broad Provider networks, including by (a) encouraging each DDMC to build strong networks throughout its entire service area, including in regions underserved by other insurers and with ample access to specialists, (b) preventing DDMCs from free-riding off each other's network-building efforts, and (c) reducing confusion among customers and Providers alike. *See Delta Dental*, 800 F. Supp. 3d at 908-10 (discussing benefits).

96. These benefits allow DDMCs—including DDWA—to recruit more Providers to Delta Dental's PPO network than would enroll absent exclusive service areas. Exclusive service areas therefore facilitate the development of the comprehensive Provider networks required under DDCA's contract with OPM. These benefits redound to OPM and non-governmental customers alike, as both use the Delta Dental PPO network.

97. Plaintiff also challenges the effective-discount standard in the DDPA Membership Standards and Guidelines. Compl. ¶¶ 35, 81-83. Effective discount is a metric that measures the total amount of savings that will accrue to customers that participate in a dental benefit plan. It reflects a weighted average of the network utilization rate and the level of the network's in- and out-of-network discounts, respectively. That means DDMCs with broad networks can achieve high



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

effective discounts while reimbursing Providers at high rates. *See Delta Dental*, 800 F. Supp. 3d at 911-12 (explaining that "the effective discount standard does not suggest that all Member Companies were required to adopt, agreed to adopt, or did adopt" reduced reimbursement rates).

98. The effective-discount standard creates an incentive for DDMCs to create broad PPO and Premier networks because doing so increases their effective discounts. Indeed, increasing network size to meet the effective-discount standard better serves the interests of DDMCs than reducing reimbursement rates because reduced reimbursements cause Providers to leave Delta Dental's networks, making Delta Dental benefit plans less attractive to customers. And, in fact, DDMCs achieve high effective discounts relative to other dental insurers because Delta Dental offers broad PPO and Premier networks while still reimbursing Providers at above-market rates.

99. The effective-discount standard redounds to the benefit of OPM and non-governmental customers alike, as both use the Delta Dental PPO network. Plus, increased Provider participation in the Delta Dental PPO network helps DDCA meet its contractual obligation to provide FEDVIP beneficiaries with access to broad Provider networks.

100. Plaintiff challenges DDWA's use of the DeltaUSA Processing Policy Manual. According to the complaint, the manual provides that reimbursements for certain procedures must "be disallowed or denied," fixing "the price for these procedures at $0." Compl. ¶¶ 72-76.

101. Providers often can bill patients for procedures that their Delta Dental plans do not cover. But the DeltaUSA Processing Policy Manual forbids participating Providers from billing patients in a few special cases, such as when the Provider performs a medically inappropriate procedure or attempts to charge the patient twice for the same service.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

102. DeltaUSA's Processing Policies and DDCA's contract with OPM forbid participating Providers from billing patients in similar circumstances, such as duplicative billing for procedures that are integral to another service. The overlap between the DeltaUSA Processing Policy Manual and the requirements in DDCA's contract with OPM facilitates the quick and accurate processing of claims for FEDVIP beneficiaries. It also reflects OPM's preference for FEDVIP contractors to offer dental benefit plans that align with those available in the commercial market.

103. Plaintiff challenges the level of DDWA's surpluses and "capital reserves," which Plaintiff falsely characterizes as "supracompetitive." Compl. ¶¶ 97-102. But DDWA's surpluses and "capital reserves" help DDCA satisfy OPM's financial-reserves requirement, including through DDWA's sharing of risk for DDCA's FEDVIP contracts through the Federal Marketing Group.

104. Because the challenged conduct—including exclusive service areas, the effective-discount target, DeltaUSA's Processing Policies, and DDWA's level of surplus and "capital reserves"—helps DDWA implement Delta Dental's FEDVIP contract, it relates to DDWA's acts under a federal officer.

### 3. DDWA's Support For Delta Dental's FEDVIP Work Gives Rise To Colorable Federal Defenses.

105. DDWA has colorable federal defenses based on its support for Delta Dental's FEDVIP work.

106. One of them is federal preemption. Under 5 U.S.C. § 8959, the "terms of any contract that relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation


DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

issued thereunder, which relates to dental benefits, insurance, plans, or contracts." Section 8959 preempts state law of general application, including state antitrust and unfair competition law.

107. If Washington law rendered DDWA liable for agreeing to use the Delta Dental mark in exclusive service areas and meet effective-discount targets, as Plaintiff alleges, state law would penalize DDWA for conduct that helps maintain comprehensive Provider networks for FEDVIP beneficiaries, as DDCA's contract with OPM requires. Application of state law would thus impair the performance of that contract, triggering preemption under 5 U.S.C. § 8959.

108. If Washington law rendered DDWA liable for agreeing to follow DeltaUSA's Processing Policies, as Plaintiff alleges, state law would penalize conduct that facilitates the quick and accurate processing of claims for FEDVIP beneficiaries under the terms of DDCA's contract with OPM. Application of state law would thus impair the performance of that contract, triggering preemption under 5 U.S.C. § 8959.

109. If Washington law rendered DDWA liable for accumulating surpluses or "capital reserves," or treated surpluses or "capital reserves" as evidence of unlawful conduct, as Plaintiff alleges, state law would penalize DDWA for conduct with the purpose and effect of supporting the Federal Marketing Group, including through investments and assumption of a share of the risk of DDCA's contract with OPM. Application of state law would thus impair the performance of that contract, which requires DDCA to maintain adequate financial resources or the means of acquiring them, triggering preemption under 5 U.S.C. § 8959.

110. DDWA's support for Delta Dental's FEDVIP work confers another colorable federal defense to Plaintiff's state-law claims. *See Yearsley*, 309 U.S. at 20-21.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

111. DDWA acts under valid federal authority in supporting Delta Dental's administration of dental benefit plans for FEDVIP beneficiaries, including by adhering to the terms of the Service Mark License Agreement, the DDPA Membership Standards and Guidelines, and the DeltaUSA Processing Policy Manual, in order to develop networks and facilitate the processing of claims for FEDVIP enrollees pursuant to DDCA's contract with OPM. DDWA is therefore not liable for that conduct.

112. Yet another colorable federal defense comes from *Boyle*, 487 U.S. at 512. In this case, the government set forth precise specifications for federal contractors' FEDVIP work in the comprehensive framework of statutes and regulations discussed above. The government also set forth precise specifications for the administration of FEDVIP dental benefit plans in contracts with DDCA.

113. Delta Dental performed to the government's specifications, including with the help of DDWA and other DDMCs that formed Provider networks, established reimbursement rates, and made the reimbursement rates available in the NPF.

114. The structure of the Delta Dental joint venture is public knowledge, and the Delta Dental policies Plaintiff challenges were open to the government's inspection under OPM's contract with DDCA, so DDWA had no special knowledge of potentially harmful conduct unavailable to the United States.

115. Because (1) DDWA acted under a federal officer in helping to administer dental benefit plans for FEDVIP beneficiaries, (2) the challenged conduct relates to DDWA's support for Delta Dental's FEDVIP work, and (3) DDWA has colorable federal defenses, 28 U.S.C. § 1442(a) authorizes removal.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

### C. DDWA's Support For Delta Dental's Veterans Affairs Work Allows Removal.

116. Removal is also appropriate based on DDWA's implementation of dental benefit plans for veterans of the United States military and their families. By statute, the Department of Veterans Affairs ("VA") must "establish and administer a dental insurance plan for veterans and survivors and dependents of veterans." 38 U.S.C. § 1712C(a). This program is called the Veterans Affairs Dental Insurance Program ("VADIP").

#### 1. DDWA Acts Under A Federal Officer In Supporting Delta Dental's VADIP Work.

117. To administer VADIP dental benefit plans, the VA is required to "contract with" private "dental insurer[s]." 38 U.S.C. § 1712C(c). Dental benefit plans offered through VADIP "shall provide such benefits for dental care and treatment as the Secretary considers appropriate for the dental insurance plan, including diagnostic services, preventative services, endodontics and other restorative services, surgical services, and emergency services." 38 U.S.C. § 1712C(d). Premiums "shall be in such amount or amounts as the Secretary shall prescribe to cover all costs associated with carrying out this section." 38 U.S.C. § 1712C(f)(1). And VADIP dental plans must "be administered under such regulations as the Secretary shall prescribe." 38 U.S.C. § 1712C(i).

118. Among other things, those regulations state that "[p]remiums and copayments will be determined by VA through the contracting process," 38 C.F.R. § 17.169(c)(1), and establish "minimum[] coverage" based on a comprehensive list of required "dental care and services," *id.* § 17.169(c)(2).

119. DDCA, acting for the Federal Marketing Group, has contracted with the VA to offer dental plans to VADIP beneficiaries since at least 2022. *See* Ex. 9, Brand Decl. ¶¶ 25-34 (describing contract). DDCA's contract with the VA sets forth premium schedules, which vary by



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

region, type of dental benefit plan, and enrollment status (*e.g.*, individual or family). One rating region covers the northwestern states of Washington, Oregon, Idaho, and Alaska.

120. The contract contains a list of procedures that must be covered, including diagnostic, preventive, restorative, endodontic, periodontic, oral surgery, and other services, and provides further that coverage must be "comparable to other commercially-available dental insurance plan options." In addition, participating Providers cannot bill patients for services that are "determined to be unnecessary," "do not meet accepted standards of practice," or "are routinely performed in conjunction with or as part of another service." Beyond that, the contract sets forth "minimum network standards" designed "to ensure adequate access to VADIP beneficiaries." Those standards provide that DDCA's "network must be portable across state lines" and "include appropriate specialty care providers such as oral surgeons and endodontists." The contract also requires claims to be processed "within 30 days of receipt" at least 98% of the time.

121. To enforce these and other requirements, the contract requires DDCA to "furnish reports to allow VA to assess and monitor their plan's participation in VADIP." In addition, DDCA must "permit VA, the Government Accountability Office (GAO), and other Federal agencies with access to its VADIP records." Beyond that, the contract provides that the government will use a Quality Assurance and Surveillance Plan "to ensure that Contractor's performance reaches and maintains the required quality levels throughout the contract term," and it requires DDCA to "meet performance targets established by the [government]."

122. For these reasons, DDCA administers VADIP dental benefit plans subject to the government's instruction, direction, and guidance. It therefore acts under a federal officer in doing so.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

123. Because DDCA contracts with the VA to administer VADIP dental benefit plans on the Federal Marketing Group's behalf, and because DDWA helps DDCA implement those contracts, DDWA acts under a federal officer when doing so.

**2. DDWA's Support For Delta Dental's VADIP Work Relates To The Challenged Conduct.**

124. The challenged conduct "relat[es] to" DDWA's role in supporting Delta Dental's VADIP work. 28 U.S.C. § 1442(a).

125. VADIP dental benefit plans use the Delta Dental PPO network. Use of the Delta Dental PPO network means VADIP enrollees can obtain in-network care from Delta Dental PPO Providers, who are then reimbursed at the local DDMC's rates. Ex. 9, Brand Decl. ¶¶ 33-34 (detailing VADIP network use). Their claims are processed on the NPF under the DeltaUSA Processing Policy Manual.

126. DDWA and other DDMCs establish schedules of reimbursement rates for Delta Dental PPO Providers in their respective service areas without distinguishing between services provided to VADIP enrollees and non-VADIP enrollees. That is, a PPO Provider receives the same reimbursement for treating a VADIP beneficiary as the Provider would receive for treating a beneficiary of a non-governmental PPO dental benefit plan.

127. Delta Dental's VADIP dental benefit plans have enrolled more than 72,000 members since 2022,[4] and more than 475,000 veterans live in Washington.[5] Providers in

---

[4] Delta Dental Ins. Co., *Delta Dental of California Selected by U.S. Department of Veterans Affairs to Continue as Dental Benefits Administrator for Veterans Affairs Dental Insurance Program* (Oct. 4, 2022), https://www1.deltadentalins.com/newsroom/releases/2022/10/delta-dental-to-continue-as-a-dental-benefits-administrator-for-vadip.html.

[5] Wash. State Dep't of Veterans Affairs, *Statistics* (Sep. 30, 2025), https://dva.wa.gov/resources/statistics.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

Washington who were parties to a Delta Dental participating provider agreement, including Delta Dental PPO participating provider agreements, supplied dental goods and services to persons enrolled in VADIP dental benefit plans through Delta Dental, for which the Providers obtained reimbursements from one or more DDMCs at applicable DDWA PPO reimbursement rates, since at least 2022 to the present. DDWA's establishment of reimbursement rates therefore related to—and was inseparable from—DDWA's acts under a federal officer.

128. Other challenged conduct—including exclusive service areas, the effective-discount target, DeltaUSA's Processing Policies, and the NPF—also helps DDWA implement Delta Dental's VADIP contract.

129. Plaintiff challenges provisions in the Service Mark License Agreement and DDPA Membership Standards and Guidelines generally requiring DDWA and other DDMCs to use the Delta Dental trademark within their historic areas of operation. Compl. ¶¶ 50-62.

130. The use of exclusive service areas helps DDWA and other DDMCs build broad Provider networks, including by (a) encouraging each DDMC to build strong networks throughout its entire service area, including in regions underserved by other insurers and with ample access to specialists, (b) preventing DDMCs from free-riding off each other's network-building efforts, and (c) reducing confusion among customers and Providers alike. *See Delta Dental*, 800 F. Supp. 3d at 908-10 (discussing benefits).

131. These benefits allow DDMCs—including DDWA—to recruit more Providers to Delta Dental's PPO network than would enroll absent exclusive service areas. Exclusive service areas therefore facilitate the development of the comprehensive Provider networks required under



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

DDCA's contract with the VA. These benefits redound to the VA and non-governmental customers alike, as both use the Delta Dental PPO network.

132. Plaintiff also challenges the effective-discount standard in the DDPA Membership Standards and Guidelines. Compl. ¶¶ 35, 81-83. The effective-discount standard creates an incentive for DDMCs to create broad PPO and Premier Provider networks because doing so increases their effective discounts. Indeed, increasing network size to meet the effective-discount standard better serves the interests of DDMCs than reducing reimbursement rates because reduced reimbursements cause Providers to leave Delta Dental's networks, making Delta Dental benefit plans less attractive to customers.

133. The effective-discount standard redounds to the benefit of the VA and non-governmental customers alike, as both use the Delta Dental PPO network. Plus, increased Provider participation in the Delta Dental PPO network helps DDCA meet its contractual obligation to provide VADIP beneficiaries with access to broad Provider networks.

134. Plaintiff challenges DDWA's use of the DeltaUSA Processing Policy Manual. According to the complaint, the manual provides that reimbursements for certain procedures must "be disallowed or denied," fixing "the price for these procedures at $0." Compl. ¶¶ 72-76. Providers often can bill patients for procedures that their Delta Dental plans do not cover. But the DeltaUSA Processing Policy Manual forbids participating Providers from billing patients in a few special cases, such as when the Provider performs a medically inappropriate procedure or attempts to charge the patient twice for the same service.

135. DeltaUSA's Processing Policies and DDCA's contract with the VA forbid participating Providers from billing patients in similar circumstances. For example, both the



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

Processing Policies and the contract forbid Providers from billing patients for services "integral" to other services for which a separate charge is made. The overlap between the DeltaUSA Processing Policies and the requirements in DDCA's contract with the VA facilitates the quick and accurate processing of claims for VADIP beneficiaries.

136. Plaintiff challenges DDWA's use of the NPF database to process out-of-state claims because it allows DDMCs to access each other's reimbursement rate information. Compl. ¶¶ 76-79. Information that DDWA and other DDMCs upload to the NPF is used to process claims for VADIP beneficiaries. For example, the NPF is used to obtain the applicable DDWA PPO reimbursement rate when a VADIP beneficiary obtains dental care from a Washington Provider.

137. The NPF does not distinguish between VADIP and non-VADIP claims, all of which are processed in the same manner. Nor could the NPF draw a meaningful distinction, as VADIP beneficiaries share the Delta Dental PPO network—including the network's Providers and schedules of reimbursement rates—with other customers.

138. For these reasons, DDWA's adherence to the DeltaUSA Processing Policy Manual and use of the NPF help DDCA meet its obligation to process VADIP claims within 30 days at no less than 98% accuracy.

139. Because the challenged conduct—including exclusive service areas, the effective-discount target, DeltaUSA's Processing Policies, and the NPF—helps DDWA implement Delta Dental's VADIP contract, it relates to DDWA's acts under a federal officer.

**3. DDWA's Support For Delta Dental's VADIP Work Gives Rise To Colorable Federal Defenses.**

140. DDWA has colorable federal defenses based on its support for Delta Dental's VADIP work.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

141. One of them is federal preemption. "To achieve important Federal interests, including but not limited to the assurance of the uniform delivery of benefits under VADIP and to ensure the operation of VADIP plans at the lowest possible cost to VADIP enrollees, paragraphs (b) [coverage], (c)(1) [premiums], (c)(2) [benefits], (d) [enrollment], and (e)(2) through (5) [disenrollment] of this section preempt conflicting State and local laws, including laws relating to the business of insurance. Any State or local law, or regulation pursuant to such law, is without any force or effect on, and State or local governments have no legal authority to enforce them in relation to, the paragraphs referenced in this paragraph or decisions made by VA or a participating insurer under these paragraphs." 38 C.F.R. § 17.169(g).

142. DDCA's contract with the VA provides that terms involving "program eligibility," "program duration," "coverage locations," "plan benefits," "enrollment," "premiums, rates, responsibility for payments," and "voluntary disenrollment" will "preempt conflicting State law." Both this language and 38 C.F.R. § 17.169(g) preempt state law of general application, including state antitrust and unfair competition law.

143. If Washington law rendered DDWA liable for agreeing to use the Delta Dental mark in exclusive service areas and meet effective-discount targets, as Plaintiff alleges, state law would penalize DDWA for conduct that helps maintain comprehensive Provider networks for VADIP beneficiaries, as DDCA's contract with the VA requires. Application of state law would thus impair the performance of that contract, triggering preemption under 38 C.F.R. § 17.169(g) and the contract's express terms.

144. If Washington law rendered DDWA liable for agreeing to follow DeltaUSA's Processing Policies or use the NPF, as Plaintiff alleges, state law would penalize conduct that



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

facilitates the quick and accurate processing of claims for VADIP beneficiaries under the terms of DDCA's contract with the VA. Application of state law would thus impair the performance of that contract, triggering preemption under 38 C.F.R. § 17.169(g) and the contract's express terms.

145. DDWA's support for Delta Dental's VADIP work confers another colorable federal defense to Plaintiff's state-law claims. *See Yearsley*, 309 U.S. at 20-21.

146. DDWA acts under valid federal authority in supporting Delta Dental's administration of dental benefit plans for VADIP beneficiaries, including by adhering to the Service Mark License Agreement, the DDPA Membership Standards and Guidelines, and the DeltaUSA Processing Policy Manual, in order to develop networks and facilitate the processing of claims for VADIP enrollees pursuant to DDCA's contract with the VA. DDWA is therefore not liable for that conduct.

147. Yet another colorable federal defense comes from *Boyle*, 487 U.S. at 512. In this case, the government set forth precise specifications for federal contractors' VADIP work in the comprehensive framework of statutes and regulations discussed above. The government also set forth precise specifications for the administration of benefits for VADIP beneficiaries in contracts with DDCA.

148. Delta Dental performed to the government's specifications, including with the help of DDWA and other DDMCs that formed Provider networks, established reimbursement rates, and made the reimbursement rates available in the NPF.

149. The structure of the Delta Dental joint venture is public knowledge, and the Delta Dental policies Plaintiff challenges were open to the government's inspection under the VA's



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

contract with DDCA, so DDWA had no special knowledge of potentially harmful conduct unavailable to the United States.

150. Because (1) DDWA acted under a federal officer in helping to administer dental benefit plans for VADIP beneficiaries, (2) the challenged conduct relates to DDWA's support for Delta Dental's VADIP work, and (3) DDWA has colorable federal defenses, 28 U.S.C. § 1442(a) authorizes removal.

**D. Delta Dental's Medicare Advantage Business Allows Removal.**

151. Medicare Advantage (also called Medicare Part C) allows enrollees to obtain health benefits—including dental benefits—through private insurance companies.[6] Insurers contracting with the government to administer Medicare Advantage benefit plans are called Medicare Advantage Organizations ("MAOs") or Medicare+Choice Organizations.

152. MAOs offer "supplemental health care benefits" like dental coverage subject to the government's instruction, direction, and control. 42 U.S.C. § 1395w-22(a)(3)(A). For example, federal law sets conditions on an MAO's selection of in-network Providers, *see* 42 U.S.C. § 1395w-22(d), (j), establishes recordkeeping and reporting obligations, *see id.* § 1395w-22(e)(3), and regulates MAO coverage determinations, *see id.* § 1395w-22(g). All aspects of the MAO's operations are subject to review, including the "community rates," "premiums," and the "actuarial assumptions and data" on which they are based. 42 U.S.C. § 1395w-24(a)(5)(A). In exchange, the MAO receives payments from the government as set forth in a comprehensive funding formula. *See* 42 U.S.C. § 1395w-23.

[6] U.S. Dep't of Health & Hum. Servs., *Understanding Medicare Advantage Plans* (2023), medicare.gov/Pubs/pdf/12026-Understanding-Medicare-Advantage-Plans.pdf.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

**1. DDWA Acted Under A Federal Officer In Administering Medicare Advantage Dental Benefit Plans.**

153. Federal standards for MAOs are effected through contracts between the MAO and the government. Section 1395w-27 describes terms that must be included in these contracts, including minimum enrollment thresholds for MAOs, an agreement "to comply with the applicable requirements and standards," and anti-fraud measures like inspection and audit rights. 42 U.S.C. § 1395w-27(a), (b), (d). Contracts also must provide for "prompt payment . . . of claims submitted for services and supplies furnished to enrollees." 42 U.S.C. § 1395w-27(f)(1). Additional "terms and conditions . . . as the Secretary may find necessary and appropriate" must be included as well. 42 U.S.C. § 1395w-27(e)(1).

154. These statutes are implemented through a series of regulations governing all aspects of the Medicare Advantage program. *See* 42 C.F.R. §§ 422.1-422.2615. Regulations define the extent to which supplemental benefits (such as dental benefits) are allowed, *see* 42 C.F.R. §§ 422.102, 422.104(b)(1), establish network-breadth requirements, *see id.* § 422.116, set forth prerequisites for insurers to become MAOs, *see id.* § 422.503, and list dozens of provisions that must be included in MAO contracts with the Centers for Medicare and Medicaid Services ("CMS"), *see id.* § 422.504.

155. Because MAOs contracting with CMS "to effectuate Medicare coverage for program enrollees" help "CMS carry out its duties" while under "detailed regulation, monitoring, [and] supervision," they act under federal officers for purposes of the federal officer removal statute. *Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108 F.4th 340, 348 (5th Cir. 2024); *see also, e.g.*, *Yeomans v. Blue Shield of Cal.*, 712 F. Supp. 3d 1336, 1342 (C.D. Cal. 2024) ("MAOs administering Part C benefits fall within the category of highly regulated private contractors



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

described in *Watson* and thus are 'acting under' CMS in a manner that entitles them to removal under § 1442(a)(1).").

156. MAOs can and often do subcontract with other entities to provide services to Medicare Advantage beneficiaries. To that end, the regulations define a "[f]irst tier entity" as "any party that enters into a written arrangement, acceptable to CMS, with an MA organization or applicant to provide administrative services or health care services for a Medicare eligible individual under the MA program." 42 C.F.R. § 422.2; *see also id.* § 422.500 (similar). The regulations further define a "[d]ownstream entity" as "any party that enters into a written arrangement, acceptable to CMS, with persons or entities involved with the MA benefit, below the level of the arrangement between an MA organization (or applicant) and a first tier entity." 42 C.F.R. § 422.2; *see also id.* § 422.500 (similar).

157. Both the government and the applicable MAO (acting for the government) oversee first tier and downstream entities. Federal regulations define the terms that "contracts or written arrangements between MA organizations and first tier, downstream, and related entities must contain," including requirements that the first tier or downstream entity's work "comply with the MA organization's contractual obligations" to the government. 42 C.F.R. § 422.504(i)(3). In addition, all "contracts or written arrangements must specify that the related entity, contractor, or subcontractor must comply with all applicable Medicare laws, regulations, and CMS instructions."[7] 42 C.F.R. § 422.504(i)(4)(v).

---

[7] A copy of a CMS template can be downloaded here: https://www.cms.gov/medicare/medicare-advantage/medicareadvantageapps/downloads/model_contract_amendment_10_05_12.pdf.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

158. To enforce these provisions, "every contract must specify that the performance of the parties is monitored by the MA organization on an ongoing basis." 42 C.F.R. § 422.504(i)(4)(iii). And "[the Department of Health and Human Services], the Comptroller General, or their designees have the right to audit, evaluate, collect, and inspect any books, contracts, computer or other electronic systems, including medical records and documentation of the first tier, downstream, and entities related to CMS' contract with the MA organization," including "directly from any first tier, downstream, or related entity." 42 C.F.R. § 422.504(i)(2)(i)-(ii).

159. Because the government "mandates terms in the subcontracts between" MAOs and first tier or downstream entities and "may monitor the performance of [those entities] by auditing [their] work," first tier or downstream entities performing tasks delegated by MAOs act as federal officers for purposes of the removal statute. *Griffin v. Optum, Inc.*, 175 F.4th 897, 903 (8th Cir. 2026); *Express Scripts*, 119 F.4th at 182 n.2.

160. DDWA has administered dental benefits for Medicare Advantage plans since at least 2024 under a contract with the Community Health Plan of Washington, an MAO. *See* Ex. 8, Lo Decl. ¶¶ 7-9. Under that contract, DDWA "must comply with all applicable Medicare laws, regulations, and CMS instructions" as set forth in 42 C.F.R. § 422.504(i)(4)(v), as well as act "in compliance with CHPW's obligations under the CMS contract," *see* 42 C.F.R. § 422.504(i)(3)(iii). In particular, the contract requires DDWA to reimburse Providers promptly under 42 C.F.R. § 422.520(b)(1)-(2) and "in accordance with generally accepted standards," make dental benefits "available twenty-four (24) hours a day, seven (7) days a week," and open its records to government inspection under 42 C.F.R. § 422.504(i)(2)(i)-(iv). The contract provides further that



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

enrollees will have access to the Delta Dental PPO plus Premier network, and that Providers will be reimbursed at "PPO Fees."

161. DDWA has administered dental benefits for Medicare Advantage plans since at least 2013 under contracts with the Kaiser Foundation Health Plan of Washington (known as the Group Health Cooperative before 2017), an MAO. *See* Ex. 8, Lo Decl. ¶¶ 4-6. Under DDWA's contracts with Kaiser/Group Health, DDWA had to follow "Medicare laws, regulations and CMS instructions and guidance," as well as "Group Health's contractual obligations to CMS," and Kaiser/Group Health supervised DDWA to ensure that DDWA "performed in accordance with applicable standards, including but not limited to those described in 42 CFR Section 422 and its subparts." In particular, the contracts required DDWA to ensure that Provider agreements contained "the terms and conditions required by 42 CFR 422.504 and Chapter 11, Medicare Managed Care Manual," including with respect to "reasonable utilization management requirements," and resolve dental benefit claims "in accordance with CMS guidelines," and it opened DDWA's relevant "contracts, books, documents, papers, and records" to inspection and audit under 42 C.F.R. §§ 422.504(i)(2).

162. For these reasons, DDWA was "acting under [a federal] officer" in administering dental benefit plans for Medicare Advantage enrollees. 28 U.S.C. § 1442(a)(1).

**2. DDWA's Administration Of Medicare Advantage Dental Benefit Plans Related To The Challenged Conduct.**

163. The challenged conduct "relat[es] to" DDWA's role as an administrator of dental benefit plans for Medicare Advantage enrollees. 28 U.S.C. § 1442(a)(1).

164. Providers in DDWA's networks were entitled to the same reimbursement rates for treating patients with dental coverage through Medicare Advantage plans as for treating patients



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

with dental coverage through commercial PPO or Premier plans. That is, a PPO or Premier Provider contracted with DDWA would receive the same reimbursement for treating an enrollee of a DDWA Medicare Advantage dental benefit plan as the Provider would receive for treating an enrollee of a DDWA PPO or Premier dental benefit plan. Ex. 8, Lo Decl. ¶¶ 10-11 (detailing network use). DDWA's establishment of PPO and Premier reimbursement rates therefore related to—and was inseparable from—DDWA's acts under a federal officer.

165. Other challenged conduct helped DDWA service Medicare Advantage accounts and facilitated the development of Medicare Advantage business throughout the Delta Dental joint venture.

166. Plaintiff alleges that "DDWA and the other Delta Dental State Insurers have coordinated their conduct in accordance with a series of governing agreements." Compl. ¶ 34. One of those agreements is the DDPA Membership Standards and Guidelines, which Plaintiff alleges requires DDWA and other DDMCs "to maintain certain levels of market penetration and to satisfy effective discount requirements." Compl. ¶ 35.

167. DDWA's Medicare Advantage enrollees count toward DDWA's compliance with the market penetration target Plaintiff challenges. According to the Membership Standards and Guidelines, market penetration accounts for all Delta Dental enrollees in a region save for those "covered by public entitlement programs," but "[e]nrollees covered by a Medicare Advantage plan are not included as public entitlement program enrollees."

168. Plaintiff challenges the Service Mark License Agreement and alleges that it operates as a market-allocation mechanism. Compl. ¶¶ 50-62. The Service Mark License Agreement governs use of the Delta Dental mark in connection with Medicare Advantage



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

business. Among other things, the Agreement requires DDWA and other DDMCs "to have CMS compliant agreements or contract addenda in place with providers who treat Medicare Advantage patients and to meet all current Centers for Medicare and Medicaid Services requirements," to "develop a fee table including at least all CDT codes listed on [their] Delta Dental Medicare Advantage fee table guidelines for establishing maximum fee allowances for participating providers," and to market Medicare Advantage plans to "a group or individuals within [the DDMC's] operating Territory."

169. Exclusive service areas allow DDMCs like DDWA to service Medicare Advantage business more effectively. For example, authorizing DDMCs to use the Delta Dental mark in connection with Medicare Advantage business in exclusive service areas creates incentives for DDMCs to build strong Provider networks throughout their respective service areas (including in rural regions and with comprehensive access to specialists), prevents DDMCs from free-riding on each other's network-building efforts to the detriment of the Delta Dental joint venture as a whole, and reduces confusion among consumers and Providers alike. *See Delta Dental*, 800 F. Supp. 3d at 908-10 (discussing benefits).

170. Plaintiff alleges that the exchange of information among DDMCs through the NPF suppressed Provider reimbursement rates. Compl. ¶ 7. DDWA's input of reimbursement rates to the NPF for Medicare Advantage and PPO business cannot be separated because Washington Providers received PPO rates for treating enrollees in DDWA Medicare Advantage dental benefit plans. In addition, enrollees in DDWA's Medicare Advantage plan had access to the Delta Dental network nationwide, and the NPF was used to process their out-of-state claims.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

171. Plaintiff alleges that DDWA "share[s] confidential pricing and dentist retention and attrition information" with other DDMCs, which they falsely describe as price fixing. Compl. ¶¶ 63-71. DDMCs sometimes exchange reimbursement rate information with each other to develop their Medicare Advantage Provider networks. For example, DDIL shared certain rate information with DDCA for use in connection with DDCA's "Medicare Advantage recruitment efforts."

172. Because the challenged conduct helped DDWA service Medicare Advantage accounts, it relates to DDWA's performance of its delegated federal duties.

**3. DDWA's Medicare Advantage Work Gives Rise To Colorable Federal Defenses.**

173. DDWA has colorable federal defenses based on its work for Medicare Advantage.

174. First, the Medicare Advantage statute preempts most state laws applicable to healthcare plans offered by MAOs. Under 42 U.S.C. § 1395w-26(b)(3), the "standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part." Section 1395w-26(b)(3) preempts state law of general application, including antitrust and unfair-competition law.

175. If Plaintiff is right that state antitrust law prevents the use of performance metrics set forth in the DDPA Membership Standards and Guidelines, exclusive service areas defined in the Service Mark License Agreement, and the exchange of information among DDMCs through tools like the NPF, those state laws would operate "with respect to MA plans" that DDWA services, penalize DDWA for implementing those plans, and thus be preempted under 42 U.S.C. § 1395w-26(b)(3).



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

176. In particular, Plaintiff's use of state law to challenge the agreements under which DDWA and other DDMCs license the Delta Dental trademark in exclusive service areas conflicts with federal requirements for MAOs to define the "plan's service area" and ensure access to an adequate Provider network there. 42 U.S.C. § 1395w-22(c)(1)(A); *see also* 42 C.F.R. § 422.116. Nor can states second-guess whether the terms of DDMC Provider agreements are "reasonable" under federal law, as Plaintiff would have a court do. 42 U.S.C. § 1395w-22(j)(1). Moreover, penalizing DDWA for conduct that provided an incentive for DDWA to perform Medicare Advantage work would reduce competition for Medicare Advantage business and increase costs to the government.

177. Application of state law to bar the challenged conduct would frustrate other federal requirements, too, including for DDMCs working with MAOs "to provide prompt payment" to Providers. 42 U.S.C. § 1395w-27(f)(1). The coordination among DDWA and other DDMCs that Plaintiff believes violates state law—including use of the NPF—facilitates quick and accurate processing of Medicare Advantage claims across the United States.

178. Second, DDWA's work as a federal contractor for Medicare Advantage confers a defense to Plaintiff's state-law claims. *See Yearsley*, 309 U.S. at 20-21.

179. DDWA acted under valid federal authority in administering dental benefit plans for Medicare Advantage. In particular, DDWA complied with the applicable federal statutes, regulations, and contractual provisions when engaging in challenged conduct, including accepting the Service Mark License Agreement and the DDPA Membership Standards and Guidelines and using the NPF to process Medicare Advantage claims.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

180. Yet another colorable federal defense comes from *Boyle*, 487 U.S. at 512. In this case, the government set forth precise specifications for DDWA's Medicare Advantage work through contractual provisions that DDWA was required to include in its contracts with the relevant MAOs. These provisions incorporated applicable federal regulations governing the conduct of MAOs and applied them to DDWA.

181. DDWA complied with all applicable statutes, regulations, and contractual provisions in administering Medicare Advantage plans. The federal government understood the structure of the Delta Dental joint venture, including the use of tools like the NPF that were created with the government's encouragement to help the joint venture service federal business. DDWA's contracts with MAOs allowed the government to audit DDWA's records, so DDWA had no greater knowledge of the challenged conduct than the government.

182. Because (1) DDWA acted under a federal officer in administering Medicare Advantage accounts, (2) the challenged conduct relates to DDWA's administration of Medicare Advantage accounts, and (3) DDWA has colorable federal defenses, 28 U.S.C. § 1442(a) authorizes removal.

* * *

183. The purported exclusion of Providers enrolled in Delta Dental "public entitlement plans," Compl. ¶ 121, has no effect for purposes of federal officer removal. To start, Delta Dental's federal programs are not public entitlement plans because enrollees generally pay the premiums for their own coverage. *See, e.g.*, 5 U.S.C. § 8958(a) (FEDVIP); 38 U.S.C. § 1712C(f) (VADIP). Nor would it matter if Plaintiff had excluded federal programs. Removal is appropriate even if the plaintiffs purport to waive claims arising from the defendant's federal business when the



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

defendant's behavior toward private parties is "indivisible from its work for the federal government." *Express Scripts, Inc.*, 119 F.4th at 189; *see also, e.g.*, *Ascent*, 165 F.4th at 1006 ("What matters is that the targeted negotiations were handled holistically and that, as a result, the complaint necessarily targets federal conduct."); *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 256-57 (rejecting plaintiff's argument "that its Amended Complaint did not even mention the distribution of opioids to veterans, the DOD contract or the operation of the [TRICARE program]" as "elevat[ing] form over substance"). That is the case here because, as discussed, DDWA set uniform schedules of reimbursement rates for federal programs and non-federal programs alike, and the challenged conduct is otherwise inseparable from DDWA's conduct supporting Delta Dental's federal contracts.

## II. Removal Is Proper Under CAFA.

184. CAFA supplies an independent basis for federal jurisdiction, authorizing removal under 28 U.S.C. §§ 1332, 1441, 1446, and 1453.

185. Congress enacted CAFA to ensure "[f]ederal court consideration of interstate cases of national importance." *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 595 (2013). For this reason, "no antiremoval presumption attends cases invoking CAFA." *Dart Cherokee*, 574 U.S. at 89. Rather, CAFA "should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed." *Id.*

186. As relevant here, CAFA confers federal jurisdiction over class action lawsuits when at least one plaintiff is a citizen of a different state than at least one defendant (*i.e.*, there is minimal diversity), *see* 28 U.S.C. § 1332(d)(2)(A), the amount in controversy exceeds $5 million, *see id.*



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

§ 1332(d), and the proposed class includes at least one hundred members, *see id.* § 1332(d)(5)(B). All three requirements are satisfied in this case.

**A. Minimal Diversity Exists Under 28 U.S.C. § 1332(d)(2)(A) Because Plaintiff's Claims Overlap With Those In The *Delta Dental* Multidistrict Litigation.**

187. Plaintiff cannot prevent removal by gerrymandering the claims "to avoid the clear purpose of CAFA." *Freeman v. Blue Ridge Paper Prods., Inc.*, 551 F.3d 405, 406 (6th Cir. 2008) (upholding removal of collection of state-court suits "with identical parties and claims" covering "different, sequential six-month periods," each of which sought less than $4.9 million in damages); *see also Standard Fire*, 568 U.S. at 595 (observing that to allow "the subdivision of a $100 million action into 21 just-below-$5-million state-court actions . . . would squarely conflict with the statute's objective").

188. In particular, Plaintiff cannot "plead around the minimal diversity requirement of CAFA" by omitting diverse parties that are "already before the court in" related federal multidistrict litigation. *Simon v. Marriott Int'l, Inc.*, 2019 WL 4573415, at *3-4 (D. Md. Sep. 20, 2019); *see also, e.g.*, *Sanders v. Kia Am. Inc.*, 2023 WL 3974966, at *4-6 (C.D. Cal. June 13, 2023) (appropriate to look "beyond the pleadings" when "the claims in both actions entirely overlap"); *In re Kitec Plumbing Sys. Prods. Liab. Litig.*, 2010 WL 11618052, at *6 (N.D. Tex. Aug. 23, 2010) (similar). Commentators agree that courts can "look beyond the class definition" in assessing federal jurisdiction under CAFA "where the plaintiff seeks to pursue a lawsuit in state court consisting of claims that already are included in a CAFA suit already pending in federal court." 2 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 12:6 (22d ed. 2025).

189. Plaintiff's Washington antitrust claim "entirely overlap[s]" with the claims in the ongoing *Delta Dental* multidistrict litigation. *Sanders*, 2023 WL 3974966, at *4-5. Both Plaintiff



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

and the plaintiffs in the *Delta Dental* multidistrict litigation allege that DDPA, DeltaUSA, and the DDMCs agreed to divide markets, fix Provider reimbursement rates, and suppress competition from their respective non-Delta Dental brands (or "second brands").

190. Specifically, Plaintiff alleges "DDWA and the other Delta Dental entities have agreed that (1) the market for dental goods and services will be divided into 39 territories, each allocated to the exclusive control of a particular Delta Dental State Insurer, and (2) the Delta Dental State Insurers will not attempt to purchase dental goods and services, or to sell dental insurance to dental plan sponsors or members, outside of each Delta Dental State Insurer's allocated territory." Compl. ¶ 51. The plaintiffs in the *Delta Dental* multidistrict litigation similarly allege—in almost identical words[8]—that DDPA, DeltaUSA, and the DDMCs "have agreed (1) that the market for dental insurance will be divided into 39 territories allocated to the exclusive control of a particular Delta Dental State Insurer, and (2) that the Delta Dental State Insurers will not sell or attempt to sell dental insurance to dental plan sponsors or members outside of each Delta Dental State Insurer's allocated territory." *Delta Dental* Compl. ¶ 94.

191. In addition, Plaintiff alleges that "DDWA has used its dominant market position to lower the rates at which it reimburses Washington Dental Providers for goods and services provided to Delta Dental insureds" through "a collusive agreement reached among, and implemented through the other agreements entered between, DDWA, the other Delta Dental State Insurers, DDPA, and DeltaUSA." Compl. ¶¶ 63-64. As Plaintiff tells it, "DDWA's price fixing

[8] The federal plaintiffs' reference to "dental insurance" rather than "dental goods and services" is not a material distinction because the Northern District of Illinois has recognized that the relevant product market "is not the 'market . . . *for the sale of dental insurance*,' as [the plaintiffs] alleged in their complaint, but rather the 'market *for the purchase of dental goods and services*[.]'" *Delta Dental*, 800 F. Supp. 3d at 919 & n.16.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

takes the form of (i) sharing confidential price information and strategies to reduce reimbursement rates among the Delta Dental State Insurers, including sharing specifics quantifying the amounts by which various Delta Dental State Insurers reduced their provider reimbursements and the resulting retention of dentists in their networks; (ii) DDWA's agreement to abide by policies and protocols requiring the Delta Dental State Insurers to deny or disallow reimbursement for certain procedure codes (i.e., fixing the price for these procedure codes at $0), mandating that certain procedure codes be priced the same as a benchmark procedure code, and 'recommending' prices for other procedure codes; (iii) sharing reimbursement rate information for all procedure codes through the NPF and the NDP; and (iv) adopting an effective discount standard that essentially requires DDWA to have the lowest or among the lowest reimbursement rates of all competitor insurance companies in the State." *Id.* ¶ 64.

192. The *Delta Dental* plaintiffs lodge the exact same price-fixing allegations. They maintain that DDMCs "colluded to use their dominant market position to fix artificially low rates at which they reimburse Dental Providers for goods and services . . . by, among other things, agreeing on the form of the agreements that the Delta Dental State Insurers enter into with the Delta Providers, sharing their reimbursement data, and policing the reimbursement rates of the other Delta Dental State Insurers." *Delta Dental* Compl. ¶¶ 101-02. Those mechanisms, the *Delta Dental* plaintiffs believe, include DDMCs' alleged "information exchanges," adoption of processing policies set forth in the "DeltaUSA Processing Policy Manual," use of NPF, and establishing of "effective discount" targets. *Delta Dental*, 800 F. Supp. 3d at 908-12, 917 n.14.

193. As for second brands, Plaintiff alleges that "DDWA and the other Delta Dental entities have engaged in a mechanism that restricts the nature and amount of business DDWA and



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

the other Delta Dental State Insurers are allowed to do outside of the 'Delta Dental' brand." Compl. ¶ 89. So, too, the *Delta Dental* plaintiffs claim that DDPA has imposed "Revenue Restrictions" mandating "that the Delta Dental State Insurers limit or restrain the extent to which they conduct dental insurance business and derive revenues other than under the Delta Dental brand." *Delta Dental* Compl. ¶ 107.

194. Finally, Plaintiff alleges that this conduct suppressed competition for "dental goods and services" in a geographic market defined as "the State of Washington." Compl. ¶¶ 46-47. The *Delta Dental* plaintiffs likewise alleged that the challenged conduct suppressed competition for dental goods and services both nationwide and in "the territories that the Defendants have allocated to themselves," including Washington. *Delta Dental* Compl. ¶¶ 87-88. The cases thus involve the same market-definition allegations. *See supra* ¶ 190 n.8 (describing the Northern District of Illinois's conclusion that the products at issue in the *Delta Dental* multidistrict litigation are dental goods and services rather than dental insurance, despite confusion arising from the muddled allegations in the plaintiffs' pleadings).

195. Plaintiff and the proposed class also fall within the putative class sought in the *Delta Dental* multidistrict litigation. The plaintiffs in that case proposed an injunctive-relief class of "[a]ll Dental Providers, not owned, employed by, or involved in the management or directorship of any of the Defendants, who provide dental goods or services within the United States and were reimbursed by a Delta Dental Defendant." *Delta Dental* Compl. ¶ 140. Also proposed was a damages class defined as "[a]ll Dental Providers, not owned, employed by, or involved in the management or directorship of any of the Defendants, who provided dental goods or services to a



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

Delta Dental Insured, and who were reimbursed directly by a Defendant or subject to a Delta Dental Plan Agreement within the United States from October 11, 2015, to the present." *Id.* ¶ 141.

196. Plaintiff in this action is a Provider who supplied "dental goods and services to DDWA pursuant to his in-network contract with DDWA." Compl. ¶ 12. Plaintiff therefore falls within the proposed classes sought in the *Delta Dental* multidistrict litigation.

197. The same is true with respect to all members of the putative classes defined here. All members of the putative damages class "provided dental goods or services to a Delta Dental insured in the State of Washington, and were reimbursed directly by DDWA, and were subject to a Delta Dental participating provider agreement (excluding HMO and public entitlement plans) from May 28, 2022 through the present," Compl. ¶ 121, and therefore belong to the putative damages class defined in the *Delta Dental* multidistrict litigation. Similarly, all members of the putative injunctive-relief class "provide dental goods or services within the State of Washington and were reimbursed by DDWA," Compl. ¶ 120, and therefore belong to the injunctive-relief class defined in the *Delta Dental* multidistrict litigation.

198. Although the Northern District of Illinois denied the plaintiffs' motion for class certification in the *Delta Dental* multidistrict litigation, the plaintiffs have indicated that they disagree with the court's ruling and intend to challenge it on appeal. *See, e.g.*, [Proposed] First Am. Consolidated Class Action Compl. ¶¶ 97, 191 n.12, *In re Delta Dental Antitrust Litig.*, No. 1:19-cv-06734 (N.D. Ill. Jan. 7, 2026), ECF No. 950.

199. Beyond the overlap in classes, Plaintiff here alleges that two of the defendants in the *Delta Dental* multidistrict litigation—DDPA and DeltaUSA—instituted and facilitate the challenged conduct.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

200. To that end, the complaint describes DDPA and DeltaUSA as "administrators and watchdogs for the Delta Dental insurance plans" that serve "as vehicles for their concerted activity." Compl. ¶ 4. The complaint alleges further that the DDMCs have entered "multiple contracts" with "DDPA[] and DeltaUSA," which constitute "the anticompetitive agreements" at issue in this lawsuit. *Id.* ¶¶ 4-5. "These agreements include the Service Mark License Agreement, the Delta Dental Plans Association Membership Standards and Guidelines, the DeltaUSA Membership Agreement, the DeltaUSA Policies Manual (formerly known as the DeltaUSA Policy and Procedures Manual), and the DeltaUSA Processing Policy Manual (formerly known as the DeltaUSA Processing Policies Manual)." *Id.* ¶ 34; *see also id.* ¶ 35 (alleging that DDPA rules establish the challenged effective discount targets).

201. Plaintiff also alleges that much of the information that DDMCs supposedly exchange flows through DDPA and DeltaUSA. In the complaint's words, DDMCs "unlawfully shar[e] their provider data through DDPA," and DDPA gave "each of the Delta Dental State Insurers" access to the NPF to "divulg[e] pricing and reimbursement rate information for all dental goods and services nationwide." Compl. ¶ 33. Plaintiff thus asserts that "DDPA serves as the central hub facilitating and coordinating this information sharing" across the Delta Dental joint venture. *Id.* ¶ 65.

202. Enforcement, too, is ostensibly a DDPA prerogative. The complaint alleges that DDPA enforces the challenged conduct through "sanctions" like "monetary fines . . . imposed [on] Delta Dental State Insurers[]." Compl. ¶¶ 56-57.

203. DDPA and DeltaUSA are therefore "'active participant[s]' in the allegations made in the complaint that are 'critical to the disposition of the important issues in the litigation.'" *Laker*



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

*Airways, Inc. v. British Airways, Plc*, 182 F.3d 843, 848 (11th Cir. 1999). In addition, proceeding without DDPA and DeltaUSA may "as a practical matter impair or impede [their] ability to protect [their] interest[s]," including DDPA's trademark and contractual interests as a party to the Service Mark License Agreement and the DDPA Membership Standards and Guidelines, as well as DeltaUSA's interest in the DeltaUSA Processing Policy Manual—all of which Plaintiff seeks to negate. Wash. Super. Ct. Civ. R. 19(a); Fed. R. Civ. P. 19(a); *see also* Ex. 6, at 8-9 (detailing DDPA's and DeltaUSA's interests in this lawsuit).

204. Against this backdrop, DDPA and DeltaUSA are necessary parties to this litigation. *See* Wash. Super. Ct. Civ. R. 19(a); Fed. R. Civ. P. 19(a).

205. DDPA and DeltaUSA also have moved to intervene as defendants. *See* Ex. 6. As set forth in that motion, DDPA and DeltaUSA claim interests relating to this action because Plaintiff challenges contracts to which DDPA and DeltaUSA are parties, and they argue that resolving this case without them could impair those interests. *See* Wash. Super. Ct. Civ. R. 24(a); Fed. R. Civ. P. 24(a)(2). At a minimum, DDPA and DeltaUSA assert that their defenses—including that the challenged conduct is ancillary to the operation of a lawful joint venture and, therefore, procompetitive—share common questions of law and fact with this action.[9] *See* Wash. Super. Ct. Civ. R. 24(b); Fed. R. Civ. P. 24(b).

206. In the multidistrict litigation, Plaintiff's counsel supported transfer to the Northern District of Illinois because the "key defendants, Delta Dental Plans Association and Delta USA, are headquartered and do business in the Northern District of Illinois." Memo. of Law in Support

---

[9] If this case is remanded, a subsequent state-court order allowing intervention would eliminate any question as to the existence of minimal diversity.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

of Pls.' Mot. for the Transfer of Related Actions to the N. Dist. of Ill. 5-6, *In re Delta Dental Antitrust Litig.*, MDL No. 2931 (J.P.M.L. Dec. 13, 2019), ECF No. 1-1. Counsel's decision not to name DDPA and DeltaUSA as defendants this time despite alleging that DDPA and DeltaUSA "act as vehicles for [DDMCs'] concerted activity" and serve "as the central hub" for much of the challenged conduct, Compl. ¶¶ 4, 65, as well as counsel's prior arguments for transfer, demonstrate that the complaint was drafted "in a transparent effort to avoid federal jurisdiction," *Simon*, 2019 WL 4573415, at *4.

207. About a month before Plaintiff filed this suit, Providers in California, Massachusetts, Michigan, and Wisconsin—all represented by the same counsel, who are also the same lawyers representing the plaintiffs in the *Delta Dental* multidistrict litigation—sued DDCA, DDMA, DDMI, and DDWI. *See Daniel Meir Klein DDS APC v. Delta Dental of Cal.*, No. 26STCV13923 (Cal. Super. Ct. Apr. 30, 2026); *Levenson v. Dental Serv. of Mass. Inc.*, No. 2684CV01279 (Mass. Super. Ct. Apr. 30, 2026); *Fritz v. Delta Dental Plan of Mich., Inc.*, No. 2026-222704-CB (Mich. Cir. Ct. Apr. 30, 2026); *Cudahy Dental Assocs., S.C. v. Delta Dental of Wis., Inc.*, No. 2026CV004125 (Wis. Cir. Ct. Apr. 30, 2026). Each complaint was filed on the same day: April 30, 2026. None of these complaints named DDPA or DeltaUSA as defendants even though each one alleges, in substantially similar form, that DDPA and DeltaUSA facilitated a conspiracy among the DDMCs to suppress Provider reimbursement rates.

208. The filing of "overlapping" state court suits "by the same counsel" further indicates that Plaintiff's omission of DDPA or DeltaUSA as defendants has no legitimate basis, but rather represents an impermissible attempt to circumvent minimal diversity and negate federal jurisdiction under CAFA. *Simon*, 2019 WL 4573415, at *3; *see also Sanders*, 2023 WL 3974966,



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

at *4-5 (treating participation of "the same counsel" in duplicative state and federal suits as evidence that omission of diverse parties from state court litigation reflected improper attempt to defeat the defendant's right to remove).

209. Allowing parallel state-court litigation of "overlapping claims" targeting DDPA and DeltaUSA policies, including those set forth in the Service Mark License Agreement, the DDPA Membership Standards and Guidelines, and the DeltaUSA Processing Policy Manual, would undermine the "multistate or national interest[]" in resolving the legality of DDPA's and DeltaUSA's nationwide conduct in a single, federal forum. *Kitec*, 2010 WL 11618052, at *7. Dueling state-court rulings could, for instance, allow members of the Delta Dental joint venture to operate in some states but not others or result in different rules governing the operations of DDMCs in different states, impairing the joint venture's efforts to provide multistate dental coverage. DDMCs also would be subject to overlapping discovery obligations and potentially inconsistent pretrial rulings, including the prospect of class-action litigation in some states but not others.

210. Plaintiff's artful pleading, if allowed to defeat removal, would impose intolerable burdens on judicial resources. Last September, Plaintiff's counsel indicated to Defendants' counsel their intent to file "a multitude of new complaints" targeting members of the Delta Dental joint venture. In subsequent court filings, Plaintiff's counsel expressed a desire to litigate claims against members of the Delta Dental joint venture on behalf of "20 State-specific damages classes." Memo. of Law in Supp. of Pls.' Mot. to Amend 1, 13 n.9, *In re Delta Dental Antitrust Litig.*, No. 1:19-cv-06734 (N.D. Ill. Jan. 7, 2026), ECF No. 949.

211. Allowing Plaintiff's counsel to pursue dozens of class actions presenting identical claims in state courts across the United States would flout CAFA's purpose to allow removal of



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

"single-state class action[s]" when, as here, "the defendants engaged in conduct that could be alleged to have injured consumers throughout the country or broadly throughout several states." S. Rep. No. 109-14, at 40. But federal law cannot be circumvented in this manner: lawsuits "purport[ing] to raise only state law claims" can be removable "by virtue of the clearly manifested intent of Congress." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 66-67 (1987). For these reasons, and because the Northern District of Illinois "already had federal jurisdiction over the class actions claims that 'subsume[]' the plaintiffs' claims," DDPA's and DeltaUSA's citizenship counts in evaluating whether minimal diversity exists under CAFA for purposes of removal. *Sanders*, 2023 WL 3974966, at *4-5; *see also Simon*, 2019 WL 4573415, at *4.

212. DDPA and DeltaUSA are nonprofit corporations incorporated in Illinois whose principal places of business are in Illinois. They are therefore citizens of Illinois for purposes of diversity jurisdiction. *See* 28 U.S.C. § 1332(c). And Plaintiff is a citizen of Washington. *See* Compl. ¶ 12.

213. Because Plaintiff's citizenship differs from DDPA's and DeltaUSA's citizenship, minimal diversity exists. *See* 28 U.S.C. § 1332(d)(2)(A).

214. Minimal diversity also exists because plaintiffs in the *Delta Dental* multidistrict litigation are citizens of different states than DDWA. For example, *Delta Dental* plaintiff Dr. Rick Lindley is a citizen of California. *Delta Dental* Compl. ¶ 13. He is diverse from DDWA, which is a Washington corporation headquartered in Washington and therefore a Washington citizen.

**B. The Amount In Controversy Exceeds $5 Million.**

215. Under CAFA, "the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000." 28 U.S.C.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

§ 1332(d)(6); *see also Standard Fire*, 568 U.S. at 594-96. Although DDWA denies the claims alleged in Plaintiff's complaint and further denies that Plaintiff, or anyone else, is entitled to any monetary or other relief on a classwide basis or otherwise, the amount in controversy here satisfies the jurisdictional threshold.

216. In the *Delta Dental* multidistrict litigation, the plaintiffs' expert estimated that the challenged conduct (including the use of ESAs, the exchange of information through the NPF, and the alleged restrictions on second brands) caused about $13 billion in damages to members of a putative nationwide Provider class from 2014 to 2022. *See Delta Dental*, 800 F. Supp. 3d at 926. Based on that model, the plaintiffs asserted that the "average damages claim for an individual plaintiff in the Class" was "$50,000." Pet. for Permission to Appeal 22, *In re Delta Dental Antitrust Litig.*, No. 25-8026 (7th Cir. Oct. 6, 2025). Plaintiff's theories mirror those raised in the *Delta Dental* multidistrict litigation, so the size of each Provider's alleged damages should be about the same. Claims of "thousands of Washington Dental Providers," Compl. ¶¶ 11, 123, with an average value of $50,000 each place at least $50 million in controversy.

217. Plaintiff alleges that DDWA's CEO earned about $12 million between 2022 and 2024, and Plaintiff further alleges that this figure reflects DDWA's "supracompetitive profits," thereby placing more than $5 million in controversy. Compl. ¶ 99. Nothing in Plaintiff's complaint suggests, let alone proves, that $5 million or less is at stake, and Plaintiff has not purported to limit the request for damages to that amount.

**C. This Case Is A Putative Class Action With At Least 100 Members.**

218. Plaintiff seeks injunctive relief on behalf of a putative class of Providers "who provide dental goods or services within the State of Washington and were reimbursed by DDWA,"



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

suing "on behalf of himself and all others similarly situated as a class action under Washington Superior Court Civil Rule 23(a) and 23(b)(1) and (b)(2)." Compl. ¶ 120. In addition, Plaintiff seeks damages on behalf of a putative class of Providers who "provided dental goods or services to a Delta Dental insured in the State of Washington, and were reimbursed directly by DDWA, and were subject to a Delta Dental participating provider agreement (excluding HMO and public entitlement plans) from May 28, 2022 through the present." Compl. ¶ 121.

219. This case is therefore a "class action" as defined in 28 U.S.C. § 1332(d)(1)(B) to mean "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons." There are more than 100 class members because, as the Complaint concedes, the proposed "[c]lasses number in the thousands." Compl. ¶ 123.

220. DDWA is a nonprofit corporation, *see* Compl. ¶ 13, and therefore is not a "State[], State official[], or other governmental entit[y]" for purposes of the exclusion in 28 U.S.C. § 1332(d)(5)(A).

221. For these reasons, federal jurisdiction exists under CAFA, authorizing removal under 28 U.S.C. §§ 1332, 1441, 1446, and 1453.

## III. Other Requirements For Removal Are Satisfied.

222. Plaintiff filed this action in the King County Superior Court. Venue is proper in the United States District Court for the Western District of Washington because it is "the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

223. As required by 28 U.S.C. § 1446(a) and Local Rule 101(b), copies of all process, pleadings, and orders served upon DDWA are attached as Exhibits 1-6. A copy of the state-court docket is attached as Exhibit 7.

224. This notice of removal is timely under 28 U.S.C. § 1446(b)(1). That statute requires a notice of removal of a civil action to be filed within 30 days after the defendant receives "service of the summons and complaint, or [receives] the complaint, 'through service or otherwise,' after and apart from service of the summons." *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347-48 (1999). In this case, Plaintiff's counsel emailed DDWA's counsel a copy of the complaint and summons on June 2, 2026, and DDWA's counsel indicated that he was authorized to accept service on DDWA's behalf on June 3, 2026. DDWA's removal deadline is therefore no earlier than July 3, 2026, assuming (without conceding) that this email exchange effected service.

225. As required by 28 U.S.C. § 1446(d), DDWA will promptly file a copy of this Notice of Removal with the King County Superior Court. A Certificate of Filing the Notice of Removal in State Court will be filed contemporaneously.

226. This Notice of Removal is signed under Rule 11 of the Federal Rules of Civil Procedure, as 28 U.S.C. § 1446(a) requires.

227. By filing this Notice of Removal, DDWA does not waive any defense that may be available and reserves all such defenses. If any question arises regarding the propriety of the removal to this Court, DDWA requests the opportunity to present argument in support of its position that this case has been properly removed.

228. DDWA further reserves the right to amend or supplement this Notice of Removal.



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

WHEREFORE, DDWA respectfully removes this action from the King County Superior Court to this Court.

Dated: June 23, 2026

Respectfully submitted,

/s/*Anthony Todaro*

Anthony Todaro (WSBA No. 30393)
Anthony.todaro@us.dlapiper.com
DLA PIPER
701 Fifth Avenue Suite 6900
Seattle, Washington 98104
Tel.: (206) 839-4800

Britt M. Miller (*pro hac vice* forthcoming)
bmiller@mayerbrown.com
Daniel K. Storino (*pro hac vice* forthcoming)
dstorino@mayerbrown.com
Mayer Brown LLP
71 S. Wacker Dr.
Chicago, IL 60606
Tel.: (312) 701-8663
Fax: (312) 706-8763

## CERTIFICATE OF SERVICE

I certify that on June 23, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to those attorneys of record registered on the CM/ECF system. I further certify that I caused a true and correct copy of the foregoing to be served by email and U.S. mail on the following counsel at the addresses listed below.

| | |
|---|---|
| Nolan Anderson, WSBA# 59691<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>1109 First Avenue, Suite 210<br>Seattle, Washington 98101<br>Telephone: (206) 905-7000<br>nolananderson@quinnemanuel.com<br><br>*Attorney for Plaintiff* | ☐ Via Hand Delivery<br>☑ Via U.S. Mail<br>☑ Via E-mail<br>☑ Via the Court's E-Service Device |
| Leonid Feller, P.C.<br>Bevin Brennan<br>QUINN EMANUEL, URQUHART & SULLIVAN, LLP<br>191 N. Wacker Drive, Suite 2700<br>Chicago, Illinois 60606<br>Tel: (312) 705-7400<br>leonidfeller@quinnemanuel.com<br>bevinbrennan@quinnemanuel.com | ☐ Via Hand Delivery<br>☑ Via U.S. Mail<br>☑ Via E-mail<br>☐ Via the Court's E-Service Device |
| Ronald J. Aranoff<br>Jay S. Handlin<br>Reuben R. Bauer<br>WOLLMUTH MAHER & DEUTSCH LLP<br>500 Fifth Avenue — 12th Floor<br>New York, New York 10110<br>Tel: (212) 382-3300<br>raranoff@wmd-law.com<br>jhandlin@wmd-law.com<br>rbauer@wmd-law.com | ☐ Via Hand Delivery<br>☑ Via U.S. Mail<br>☑ Via E-mail<br>☐ Via the Court's E-Service Device |
| Gregory P. Hansel<br>Michael S. Smith<br>Elizabeth F. Quinby | ☐ Via Hand Delivery<br>☑ Via U.S. Mail |



DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104-7029
Tel: 206.839.4800

| | |
|---|---|
| PRETI, FLAHERTY, BELIVEAU & PACHIOS, LLP<br>One City Center<br>P.O. Box 9546<br>Portland, ME 04112-9546<br>Tel: (207) 791-3000<br>ghansel@preti.com<br>msmith@preti.com<br>equinby@preti.com | ☑ Via E-mail<br>☐ Via the Court's E-Service Device |
| Robert N. Kaplan<br>Gregory Arenson<br>Elana Katcher<br>KAPLAN FOX & KILSHEIMER LLP<br>800 Third Avenue<br>New York, New York 10022<br>Tel: (212) 687-1980<br>rkaplan@kaplanfox.com<br>garenson@kaplanfox.com<br>ekatcher@kaplanfox.com | ☐ Via Hand Delivery<br>☑ Via U.S. Mail<br>☑ Via E-mail<br>☐ Via the Court's E-Service Device |
| William P. Creasman<br>CARNEY, BATES, AND PULLIAM, PLLC<br>One Allied Drive, Suite 1400<br>Little Rock, Arkansas 72201<br>Tel: (501) 312-8500<br>wcreasman@cbplaw.com | ☐ Via Hand Delivery<br>☑ Via U.S. Mail<br>☑ Via E-mail<br>☐ Via the Court's E-Service Device |
| Stanley D. Bernstein<br>Stephanie M. Beige<br>BERNSTEIN LIEBHARD LLP<br>10 East 40th Street<br>New York, NY 10016<br>Tel: (212) 779-1414<br>bernstein@bernlieb.com<br>beige@bernlieb.com | ☐ Via Hand Delivery<br>☑ Via U.S. Mail<br>☑ Via E-mail<br>☐ Via the Court's E-Service Device |
| William G. Caldes<br>Mary Ann Giorno Geppert<br>SPECTOR ROSEMAN & KODROFF, P.C.<br>2001 Market Street, Suite 3420<br>Philadelphia, PA 19103<br>Tel: (215) 496-0300<br>bcaldes@srkattorneys.com<br>mgeppert@srkattorneys.com | ☐ Via Hand Delivery<br>☑ Via U.S. Mail<br>☑ Via E-mail<br>☐ Via the Court's E-Service Device |

| | |
|---|---|
| John R. Malkinson<br>MALKINSON & HALPERN, P.C.<br>33 North Dearborn Street, Suite 1540<br>Chicago, IL 60602<br>Tel: (312) 427-9600<br>jmalkinson@mhtriallaw.com | ☐ Via Hand Delivery<br>☑ Via U.S. Mail<br>☑ Via E-mail<br>☐ Via the Court's E-Service Device |
| Eric L. Cramer<br>Patrick F. Madden<br>BERGER MONTAGUE PC<br>1818 Market Street, Suite 3600<br>Philadelphia, PA 19103<br>Tel: (215) 875-3000<br>Fax: (215) 875-4604<br>ecramer@bm.net<br>pmadden@bm.net | ☐ Via Hand Delivery<br>☑ Via U.S. Mail<br>☑ Via E-mail<br>☐ Via the Court's E-Service Device |
| Ryan McDevitt<br>KELLER ROHRBACK L.L.P.<br>1201 Third Avenue, Suite 3200<br>Seattle, WA 98101<br>Tel: (206) 623-1900<br>rmcdevitt@kellerrohrback.com | ☐ Via Hand Delivery<br>☑ Via U.S. Mail<br>☑ Via E-mail<br>☐ Via the Court's E-Service Device |
| Simon B. Paris<br>SALTZ, MONGELUZZI, & BENDESKY, P.C.<br>1650 Market Street, 52nd Floor<br>Philadelphia, PA 19103<br>Tel: (215) 575-3986<br>sparis@smbb.com | ☐ Via Hand Delivery<br>☑ Via U.S. Mail<br>☑ Via E-mail<br>☐ Via the Court's E-Service Device |
| Melissa R. Emert<br>KANTROWITZ GOLDHAMER & GRAIFMAN P.C.<br>135 Chestnut Ridge Road, Suite 200<br>Montvale, NJ 07645<br>Tel: (866) 971-0927<br>memert@kgglaw.com | ☐ Via Hand Delivery<br>☑ Via U.S. Mail<br>☑ Via E-mail<br>☐ Via the Court's E-Service Device |

| | |
|---|---|
| David P. McLafferty<br>MCLAFFERTY LAW FIRM, P.C.<br>923 Fayette Street<br>Conshohocken, PA 19428<br>Tel: (610) 940-4000 ext. 12<br>dmclafferty@mclaffertylaw.com | ☐ Via Hand Delivery<br>☑ Via U.S. Mail<br>☑ Via E-mail<br>☐ Via the Court's E-Service Device |

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

Dated this 23rd day of June, 2026.

*s/ Jenelle Barrett*
Jenelle Barrett, Legal Executive Assistant